[No. B003348. Second Dist., Div. One. July 25, 1984.]

E&H WHOLESALE, INC., Plaintiff and Appellant, v.
GLASER BROS. et al., Defendants and Respondents.

COUNSEL

Latham & Watkins, Max L. Gillam, Alan B. Clark and Robert A. Rosenbaum for Plaintiff and Appellant.

Wright & L'Estrange, Robert C. Wright and John C. O'Neill for Defendants and Respondents.

OPINION

**SPENCER, P. J.—**

INTRODUCTION

Plaintiff appeals from the trial court's denial of its request for a preliminary injunction.

STATEMENT OF FACTS

Plaintiff E&H Wholesale, Inc. (E&H), defendants Glaser Bros. (Glaser) and the Bram Division (Bram) of Core-Mark Distributors, Inc. (Core-Mark), are wholesale distributors of cigarettes in Southern California; both Glaser and Bram are wholly owned subsidiaries of Core-Mark International, Inc.

Ninety percent of the cigarettes purchased by defendants for distribution were purchased from six major domestic manufacturers. Each manufacturer charged its customers the same invoice price; terms and conditions were identical regardless of the buyer's identity.

Manufacturers allowed a 3.25 percent reduction from their list price for payment received within a stated number of days; a 2 percent reduction was allowed for payment if mailed within the stated time. Discount terms extended by the R.J. Reynolds Tobacco Company exemplify standard procedure in the industry:

<blockquote>
"TERMS
3.25% PAYMENT REC 14 DAYS
2% D/C IF MAILED 14 DAYS
OTHERWISE PAST DUE."
</blockquote>

During the period of June 30, 1983, through December 15, 1983, the list price charged by manufacturers for a carton of regular cigarettes, including state tax of approximately $1, was $6.68. During the same period, Glaser sold cigarettes at $6.57 per carton; Bram charged its customers $6.65.

Declarations established two of defendants' customers began to purchase cigarettes from defendants only after defendants offered prices below those charged by plaintiff. Defendants' new customers had previously been satisfied with plaintiff's services.

According to Anthony S. Regensburg (Regensburg), Glaser's president, "Glaser Bros. has never acted in the marketplace with the intention to injure E&H Wholesale, Inc., or to target customers served by that company for solicitation. Nor has Glaser Bros. acted to destroy competition by eliminating competitors or any other such activity." Regensburg also noted, "The nature of the market is such that no rational cigarette distributor or wholesaler could sell at a loss to drive out competitors and then plan to recoup the losses later by raising prices to non-competitive levels. The remaining competitors, or new companies, would simply take away the customers with lower prices." With respect to sales below cost, Regensburg stated, "To the best of my knowledge, Glaser Bros. has not sold cigarettes to an account at below cost."

Eliseo Martinez, representing Tony's Distributing Company, noted, "In May, 1983, Glaser, through Mr. Bell, authorized me to pay less than the invoice price for cigarettes." Parunak Celik, of Par Foods, stated that he paid defendant $6.60 per carton of cigarettes despite the fact that the invoice price read $6.64. The depositions of Myron Forst and Larry Dart, also

customers of Glaser, establish, however, that neither was offered a discount from the price specified on invoices which they received from Glaser.

In his declaration, James William Bell, sales manager for Glaser's Los Angeles branch, explained the purpose of the discounts given Tony's Distributing Co. and Par Foods. Bell noted, "The circumstances surrounding the three cent discount are as follows: Tony's had asked repeatedly for a lower price. . . . Tony Martinez had previously advised me of competing offers from other distributors at about three cents per carton lower than what he was paying Glaser Bros. . . . [¶] In August and November, 1983, I authorized Tony's to take a seven-cent per carton and then a ten-cent per carton discount on cigarettes off the invoice price. . . . Again, these discounts were given at Mr. Martinez' request after he informed me of competitive offers to sell him cigarettes at these prices. I met but did not exceed these competitive offers."

With respect to Par Foods, Bell stated, "In the early summer of 1982, Mr. Celik asked me for a lower price on cigarettes due to a competitive offer from E&H Wholesale, Inc. I matched the E&H price but, to assure payment within terms, I insisted that Mr. Celik deduct the payment off the invoice rather than change the invoice price. [¶] There was nothing secret or discriminatory about the discount to Mr. Celik. It was simply a credit tool." Moreover, Bell believed "the use of discounts to enforce credit terms is commonly employed by many companies."

On November 18, 1983, E&H filed suit against Glaser, seeking a temporary restraining order to prevent defendants from continuing sales of cigarettes below cost and with secret rebates; the requested restraining order was denied. On January 10, 1984, E&H's request for a preliminary injunction was also denied.

CONTENTIONS

I

Plaintiff contends the trial court abused its discretion by determining that defendants had not violated section 17043 of the Unfair Practices Act, inasmuch as defendants sold cigarettes below cost with intent to injure or destroy competition.

II

Plaintiff also contends the trial court abused its discretion by determining that defendants had not violated section 17045 of the Unfair Practices Act by offering secret rebates to selected customers.

DISCUSSION

I

■ Plaintiff contends defendants violated the California Unfair Practices Act by selling cigarettes below cost with the intent to injure or destroy competition.[1] We agree.

■ Initially, we note that the trial court is entitled to exercise its discretion when determining whether to grant a preliminary injunction. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) Absent a demonstrable abuse of that discretion, the determination of the trial court will not be disturbed on appeal. (*Ibid.*) However, we need not affirm if the injury resulting from the alleged wrong is sufficient to establish a " 'manifest miscarriage of justice.' " (*Ford* v. *State of California* (1981) 116 Cal.App.3d 507, 516 [172 Cal.Rptr. 162]; quoting from *Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].)

■ According to the California Business and Professions Code, the trial court "*shall* enjoin the defendant from doing all acts which are prohibited by the "Unfair Practices Act. (§ 17078; italics added.) The use of the word "shall" in section 17078 has been construed by our courts to require the mandatory grant of an injunction; however, the injunction will issue only upon demonstration of a clear violation of the Act. (*California Assn. of Dispensing Opticians* v. *Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 433 [191 Cal.Rptr. 762]; *Kofsky* v. *Smart & Final Iris Co.* (1955) 131 Cal.App.2d 530, 532 [281 P.2d 5].)

Section 17043, the focal point of the case at bar, provides, "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor . . . for the purpose of injuring competitors or destroying competition." Thus, an injunction must issue if the evidence is sufficient to establish that defendants violated section 17043.

The cost of distribution, in turn, is defined by section 17026 as "the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor, plus the cost of doing business by the distributor and vendor. . . ." Of particular importance, is the direction that "Discounts granted for cash payments shall not be used to reduce cost." (§ 17026.) The cost of doing business consists of all costs "incurred in the

---

[1] Unless otherwise noted, all code sections refer to the Unfair Practices Act, section 17000 et seq., of the Business and Professions Code.

conduct of the business," including "labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising." (§ 17029.)

■■■ On the facts of the case at bar, there can be no doubt that defendant sold cigarettes below cost, for the following facts are uncontradicted: Between June 30, 1983, and December 15, 1983, various manufacturers sold cigarettes to distributors at $5.68 per carton; the additional $.9915 charge for the state stamp increased the cost to the distributor to $6.68. Distributors, including defendants, incurred overhead costs. Payment remitted to the manufacturers varied depending upon the date by which payment was either mailed or received. Despite the cost of $6.68 per carton plus overhead, Glaser sold cigarettes at $6.57 per carton; Bram charged its customers $6.65.

Although both plaintiff and defendants have devoted significant energy to the determination of the proper measure of overhead, the cost of doing business, which must be added to the invoice cost, the specific cost of overhead is irrelevant, for even without considering overhead, defendants clearly engaged in the sale of cigarettes at a price below invoice cost. In order to avoid this conclusion, defendants argue that the invoice cost is not the manufacturer's list price, but rather the actual price paid to manufacturers. Thus defendants assert "invoice cost" should be defined by the "trade discount" available to distributors.

Plaintiff attributes the disparity between the list price and the list price reduced by discounts for payment mailed or received within a stated number of days to "discounts for cash," within the meaning of section 17026; as noted *ante,* such discounts may not be used to reduce the cost of goods. (§ 17026.) Defendants, on the other hand, argue that the contested terms represent "trade discounts" which actually determine the cost of a specific product. ■■■ Consideration of such discounts in order to avoid being charged with the sale of goods below cost, according to defendants, would not be proscribed by section 17026. The terms "discount for cash" or "cash discount" and "trade discount" do denote distinct types of discounts. A "trade discount" is a device used by manufacturers to offer a reduced price to certain customers; as such, it is considered a reduction in sales price. (*United States* v. *California Portland Cement Company* (9th Cir. 1969) 413 F.2d 161, 174.) Thus, the "trade discount" serves to *define the actual selling price* to members of a particular trade.

A "discount for cash" or "cash discount," on the other hand, is a discount from the price of sale and is given as a reward for prompt payment;

it *does not reduce the actual price* of an item. (*Sperry & Hutchinson Co.* v. *Margetts* (1953) 25 N.J. Super. 568 [96 A.2d 706, 712].) According to Webster's Dictionary, a "cash discount" is "a discount granted in consideration of immediate payment or payment within a prescribed time." (Webster's 3d New Internat. Dict. (1981) p. 346.)

An excerpt from the declaration of Dan Driskill, Director of Credit of Philip Morris U.S.A., supports our conclusion, i.e., the discounts in the instant case were indeed "discounts for cash." According to Driskill, "In 1982, purchasers from Philip Morris U.S.A. received a 2% discount if payment was mailed by the 14th day after the normal delivery date. An additional 1.25% anticipation allowance is allowed if payment was received by the 10th day after the normal delivery date. In 1983, the additional 1.25% anticipation allowance was available if payment was received by the 12th day after the normal delivery date. [¶] These are trade discounts as there are no other terms for payment."

Thus, there can be no doubt that the availability and the amount of the discount was dependent upon the date of payment. More to the point, the purchase price, rather than being defined by the identity of the buyer, was fixed by the manufacturer and reduced for payment received by a certain date, regardless of the identity of the buyer. Driskill made perfectly clear that the 2 percent discount was available only "if payment was mailed by the 14th day . . . ." The full 3.25 percent discount was available only if payment was received even earlier. Both discounts were a reduction in a previously set price; as such, they constituted "discounts for cash." In accord with section 17026, such discounts may not be used to reduce cost.

■ Inasmuch as defendants did sell cartons of cigarettes at prices well below the invoice cost of $6.68, we turn now to the determination of whether the evidence sufficiently established that defendants intended to injure or destroy competition, for a violation of section 17043 requires both act and intent. (*Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 658 [82 P.2d 3, 111 A.L.R. 486].) The requisite intent, however, is presumed upon proof of sales below cost and injurious effect. (§ 17071.)

Sales below cost have been established *ante;* injurious effect is also demonstrable. Declarations provided by two of defendants' customers who had previously purchased cigarettes from plaintiff establish beyond question that merchants, previously satisfied with plaintiff's services, began to purchase cigarettes from defendants only after defendants offered lower prices.

■ In view of evidence establishing both sales below cost and injurious effect, intent to injure competition must be presumed. (§ 17071.) The req-

uisite intent, however, may be rebutted. (*Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199, 209 [45 Cal.Rptr. 878, 404 P.2d 486].) In *Tri-Q, Inc.*, the California Supreme Court addressed a similar situation. There, the court concluded that testimony given by the president of the defendant company was sufficient to rebut the presumption of intent to injure competition. The witness testified that he knew of no company policy or decision to sell products below cost, that management had not intended to sell products below cost and that he was unaware of any attempt to destroy the plaintiff's business.

The record in the case at bar contains the declaration of Anthony S. Regensburg, president of defendant company, Glaser. Regensburg declared that "Glaser Bros. has never acted in the marketplace with the intent to injure E&H Wholesale, Inc., or to target customers served by that company for solicitation. Nor has Glaser Bros. acted to destroy competition by eliminating competitors or any other such activity." Regensburg also noted, "The nature of the market is such that no rational cigarette distributor or wholesaler could sell at a loss to drive out competitors and then plan to recoup the losses later by raising prices to non-competitive levels. The remaining competitors, or new companies, would simply take away the customers with lower prices." With respect to sales below cost, Regensburg stated, "To the best of my knowledge, Glaser Bros. has not sold cigarettes to an account at below cost."

Although Regensburg's testimony closely parallels that relied upon in *Tri-Q, Inc.*, it is not conclusive, for the record also contains the deposition of Nathan M. Bram, president of the Bram Division of defendant Core-Mark. In the following passage, Bram described his method of soliciting new customers:

"Q. Once he told you the price he was paying, what did you do to determine what price you would quote to him? Did you have to do any kind of arithmetic?

"A. No.

"Q. You just leaned back and scratched your head and said, '6.71 might be a nice figure'?

"A. I think I can sell it to you for that price.

"Q. My question is, how did you arrive at that price?

"A. *Arbitrarily.*

"Q. You just stroked your chin—

"A. That's right.

"Q. —and said, '6.71'?" (Italics added.) It is apparent, therefore, that defendants were not concerned with determining the price of cigarettes pursuant to the statutory criteria. Moreover, Bram's further testimony clearly indicates that defendant's determination of price was purposely calculated to obtain business by undercutting prices offered by their competitors.

"Q. Speaking now just in regard to cigarettes, of those customers you quoted cigarette prices to, have you in most cases gotten their business if you beat the price they had?

"A. Maybe 50 percent of the time.

"Q. Those 50 percent that don't buy, do they tell you why they're not buying from you?

"A. Yes.

"Q. What reasons have you been told?

"A. They have no reason to change, it's not enough of a differential or they've gone back to their present supplier telling them what I quoted and causing him to meet the price.

"Q. When a customer tells you of an existing price for cigarettes, do you try to beat that price by some minimum amount?

"A. Very nominal amount.

"Q. In other words, if you beat his price by one cent a carton, is that normally going to be enough to get the business or do you feel you've got to go lower than that?

"A. Yes."

Given such testimony, evidencing defendant's clear intent to undercut prices regardless of the statutory criteria, we cannot construe the record as sufficient to overcome the presumption of intent to injure competition. Thus, we find the trial court's denial of plaintiff's request for a preliminary injunction a " 'manifest miscarriage of justice' " (*Ford* v. *State of California, supra,* 116 Cal.App.3d 507, 516; quoting from *Brown* v.

*Newby, supra,* 39 Cal.App.2d 615, 618), for defendants have clearly violated section 17043.

## II

 Plaintiff also contends the trial court abused its discretion by determining that defendants had not violated section 17045 of the Unfair Practices Act by offering secret rebates to selected customers. We are compelled by the standard of review, applicable to the determination of whether a court has abused its discretion, to disagree.

 Section 17045 proscribes "The secret payment or allowance of rebates, . . . not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor." Section 17045 further provides that such rebates are unlawful if they tend "to destroy competition." Thus, a violation of section 17045 consists of three elements: (1) a secret payment or rebate, (2) the injury of a competitor and (3) the tendency of such rebate to destroy competition.

Plaintiff proffers the declarations of several of Glaser's customers in order to establish a "bizarre pricing practice of which others [customers] were not aware." Plaintiff also asserts, "Glaser does not announce its practice to its customers at large."

The evidence proffered by plaintiff does establish that certain customers were authorized to pay prices below those specified on Glaser's invoices. Eliseo Martinez, of Tony's Distributing Co., stated, "In May, 1983, Glaser, through Mr. Bell, authorized me to pay less than the invoice price for cigarettes." Parunak Celik, of Par Foods, stated that he had paid defendant $6.60 per carton of cigarettes despite the fact that the invoice price read $6.64.

 We construe the above as sufficient evidence of a secret rebate. The facts, however, remain insufficient to establish a violation of section 17045, for the evidence does not support a finding that the rebates or discounts tended to destroy competition. In his declaration, James William Bell, sales manager for Glaser's Los Angeles branch, explained the purpose of the discounts given Tony's Distributing Co. and Par Foods. Bell noted, "The circumstances surrounding the three cent discount are as follows: Tony's had asked repeatedly for a lower price. . . . Tony Martinez had previously advised me of *competing offers* from other distributors at about three cents per carton lower than what he was paying Glaser Bros. . . . [¶] In August and November, 1983, I authorized Tony's to take a seven-cent per carton and then a ten-cent per carton discount on cigarettes off the

invoice price. Again, these discounts were given at Mr. Martinez' request after he informed me of *competitive offers* to sell him cigarettes at these prices. I met but did not exceed these competitive offers." (Italics added.)

With respect to Par Foods, Bell stated, "In the early summer of 1982, Mr. Celik asked me for a lower price on cigarettes due to a *competitive offer* from E&H Wholesale, Inc. I matched the E&H price but, to assure payment within terms, I insisted that Mr. Celik deduct the payment off the invoice rather than change the invoice price. [¶] There was nothing secret or discriminatory about the discount to Mr. Celik. It was simply a credit tool." (Italics added.)

From the foregoing, it is clear that discounts offered by Glaser to Par Foods and Tony's Distributing Co. tended not to destroy competition, but rather, to meet the demands thereof, for in each instance, the discount was granted in order to meet offers made by competitors. Thus, the Bell declaration provided ample support for the court's conclusion that defendants had not violated section 17045, for the instant statute does not proscribe cost reductions designed to meet the demands of the marketplace. In the absence of evidence sufficient to establish a tendency to destroy competition, the court's conclusion on this issue must be affirmed.

The order denying the preliminary injunction on the basis of secret rebates is affirmed; the order is reversed and remanded to the trial court, however, for the issuance of a preliminary injunction on the basis of defendant's violation of section 17043.

Lillie, J., and Hanson (L.Thaxton), J., concurred.

A petition for a rehearing was denied August 21, 1984, and respondents' petition for a hearing by the Supreme Court was denied September 27, 1984. Mosk, J., did not participate therein.