McLANE COMPANY, INC. *v.* Richard A. WEISS,
Director of the Arkansas Department of Finance and
Administration, and
Tim Leathers, Commissioner of Revenue for the State of
Arkansas.
Earl Gill Wholesale, Inc.; Glidewell Distributing, Inc.; Shinn
Wholesale Co., Inc.; Tom Fitts Tobacco Co., Inc.; Warehouse
Distributing Co., Inc.; Southern Cigar & Candy, Inc.; M & K
Grocer Co., Inc.; Northwest Tobacco & Candy Co., Inc.; and
Douglas Tobacco Co., Inc., Intervenors

97-559 965 S.W.2d 109

Supreme Court of Arkansas
Opinion delivered March 19, 1998

288

*Morphew & Olson*, by: *Joe Morphew* and *Williams & Anderson*, by: *Peter G. Kumpe* and *Stephen B. Niswanger*, for appellants.

*Malcolm P. Bobo*, for appellees Richard A. Weiss and Tim Leathers.

*Lax, Vaughan, Pender & Evans, P.A.*, by: *Audrey R. Evans* and *Walter Skelton*, for intervening appellees.

TOM GLAZE, Justice. Appellant McLane Company, Inc., a wholly owned subsidiary of Wal-Mart Stores, Inc., is a Texas corporation and wholesaler of cigarettes and other products, and is licensed to do business in Arkansas. McLane brings this appeal, questioning the constitutionality of Arkansas's Unfair Cigarette Sales Act, Ark. Code Ann. § 4-75-701 -713 (Repl. 1996), which was enacted in 1951. The declared purpose of the Act is to promote fair and honest competition by prohibiting the sales of cigarettes below cost in the wholesale or retail trades that are made with the intent of injuring competitors or destroying or substantially lessening competition.

The Unfair Cigarette Sales Act defines the cost to wholesalers as the wholesaler's basic cost of the cigarettes plus the cost of doing business as evidenced by the standards and methods of accounting regularly employed by the wholesaler. § 4-75-702(11)(A).[1] Especially significant to this litigation, the Act pro-

---

[1] Section 4-75-702(11)(A) further provides the cost of doing business must include, without limitation, labor costs, including salaries of executives and officers, rent, depreciation, selling costs, maintenance of equipment, delivery costs, all types of licenses, taxes, insurance, and advertising.

vides that, in the absence of proof of a lesser or higher cost of doing business by the wholesaler making the sale, the "cost of doing business shall be *presumed to be two percent* of the basic cost of the cigarettes" to the wholesaler plus cartage to the retailer outlet, "which cartage cost in the absence of proof of a lesser or higher cost, shall be *presumed to be three-fourths of one percent* of the whole-saler's basic cost of the cigarettes."[2] (Emphasis added.)

Also pertinent to this case on appeal are those provisions of the Act that provide that the State's Director of the Department of Finance and Administration (Director), an appellee herein, is empowered with the authority to prescribe, adopt, and enforce rules and regulations to enforce the Act. § 4-75-706. Under this authority, the Director promulgated Miscellaneous Tax Regulations 1988-2, which provides that a wholesaler's cost of doing business is presumed to be four percent, not the two percent set out in the Act, and the regulation stated the four percent cost of doing business had been determined as a result of cost surveys and other information compiled and received. *See* §§ 4-75-706(a)(2) and 4-75-711(b).

This legal dispute actually began when, on October 18, 1995, McLane contacted the Department of Finance & Administration (DFA), requesting it to repeal Regulation 1988-2 and the Regulation's four percent requirement. In accordance with the provisions of the Act and the Regulation allowing a wholesaler to present proof of a lesser cost-of-doing-business amount, McLane submitted to the DFA a detailed and lengthy cost analysis and report, reflecting a lesser cost of doing business than that presumed by either the Act or Regulation 1988-2. After the DFA's review of McLane's proof, the Director approved and established a lesser doing-business cost at one-half of one percent of the basic cost of cigarettes, thereby making the minimum selling price the basic cost of cigarettes plus one-half of one percent, rather than the pre-

---

[2] Basic cost of cigarettes under the Act means whichever of the two following costs is lower, namely, the invoice cost of cigarettes to the wholesaler, or the lowest replacement cost of cigarettes to the wholesaler, within thirty days prior to the sale, in the quantity last purchased less all trade discounts except customary discounts for cash, plus the full face value of any stamps or any tax required by any state or local cigarette tax if not already included in the wholesaler's invoice cost. *See* § 4-75-702(10).

sumed two or four percent. The Director's approval resulted in the DFA promulgating Miscellaneous Tax Regulation 1995-5, which established that a wholesaler's cost of doing business is one-half of one percent of the basic cost of cigarettes. On October 25, 1995, the Director notified McLane in writing that, on November 6, 1995, McLane could commence to sell cigarettes at the new minimum price.

On November 1, 1995, events began to change. On this date, McLane's competitors filed suit for a preliminary injunction in Chicot County Chancery Court, requesting that the DFA be prohibited from implementing the new Regulation 1995-5 until such time as the DFA developed administrative rules and procedures to review the statutorily mandated proof required to establish a wholesaler's cost of doing business. The Chicot County Chancery Court granted the petitioners' request for injunctive relief. Though McLane was not a party to the Chicot County suit, the chancery court's order enjoined the Director from establishing one-half of one percent above the basic cost of cigarettes as the cost of doing business to McLane. The DFA subsequently rescinded its earlier approval of McLane's new cost-of-doing-business amount.

On November 16, 1995, McLane filed this suit in Pulaski County Chancery Court against the Director, alleging the State's Act and Regulation 1988-2 are overbroad and unconstitutional deprivations of McLane's due process rights.[3] On December 4, 1995, the Pulaski County Chancellor permitted McLane's competitors (collectively referred herein as Intervenors), to intervene, and the Director and Intervenors defended the Act's and Regulation's constitutionality. On October 30, 1996, the Pulaski County Chancery Court upheld the laws' constitutionality by granting Intervenors' motion for summary judgment, denying McLane's summary judgment motion, and dismissing McLane's complaint. McLane brings this appeal, contending the chancellor erred in holding the Act and Regulation to be constitutional, but

---

[3] Tim Leathers, the Commissioner of Revenue and Deputy Director of the DFA, was also made a party defendant, but since he serves under the Director in these circumstances, for writing purposes, we refer merely to the Director.

alternatively urges further that Regulation 1988-2 is facially inconsistent with the Act and was arbitrarily promulgated. McLane adds, too, that the Act and Regulation are invalid because they are so vague that they can be and have been enforced arbitrarily.

 The Intervenors initially argue that McLane's appeal should be dismissed for its having failed to comply with Ark. R. App. P. 5(b) by obtaining an improper extension and filing an untimely record. The Intervenors' dismissal motion was previously considered and denied by this court on June 9, 1997, and we do not revisit that issue a second time. However, we do address the Intervenors' preservation-of-issue arguments concerning McLane's alternative contentions (1) that Regulation 1988-2 is facially inconsistent with the Act, and (2) that both the Act and Regulation are so vague that they can be and have been arbitrarily enforced. McLane concedes the lower court's order did not specifically address these two arguments. However, McLane in its summary judgment motion below did contend Regulation 1988-2 was contrary to the Act and invalid, and in response, the trial court summarily rejected McLane's contention, by ruling the Regulation was neither arbitrary nor contrary to the Act. However, we fail to find in the chancellor's order where he ruled on McLane's "vagueness" argument. Thus, though we conclude McLane adequately preserved its argument asserting Regulation 1988-2 is facially inconsistent with the Act, we will not reach its vagueness argument, since the trial court neither addressed it, nor did the court rule on the issue. *See Morrison v. Jennings*, 328 Ark. 278, 284, 943 S.W.2d 559, 562 (1997).

 Before leaving procedural matters, the Intervenors also claim McLane failed to preserve its argument that the disputed Act and Regulation violate McLane's due process rights under Art. 2, § 8, of the Arkansas Constitution. In making its claim, Intervenors attempt to enlarge and strengthen their constitutional due process argument to a review of cases decided in other jurisdictions where Intervenors suggest that a majority of the courts have found statutes similar to our State's Unfair Cigarette Sales Act to be constitutional. McLane, on the other hand, leans heavily on Arkansas cases *Ports Petroleum v. Tucker*, 323 Ark. 680, 916 S.W.2d 749

(1996), and *Wal-Mart Stores, Inc. v. American Drugs, Inc.*, 319 Ark. 214, 891 S.W.2d 30 (1995), when arguing the Act is constitutionally infirm. We believe McLane unequivocally preserved its due process claim under the Arkansas Constitution, and did so by relying upon the case of *Ports Petroleum*, where we held that Section 4 of Act 380 of 1993 (of the Arkansas Petroleum Trade Practices Act) violated the Due Process Clause of the Arkansas Constitution. In sum, we concluded in *Ports Petroleum* that Act 380 was overbroad in that it prohibited legitimate and innocent competition fostered by below-cost sales, and that the Act failed to include a prohibition against such sales made with predatory intent to damage and destroy competition. McLane argued below, and now on appeal, that *Ports Petroleum* is controlling here and subjects Arkansas's Unfair Cigarette Sales Act to the same constitutional-death knell administered to Section 4 of the Arkansas Petroleum Trade Practices Act. Consequently, we disagree with Intervenor's claim that McLane is precluded from arguing the Unfair Cigarette Sales Act's validity under the Due Process Clause in Art. 2, § 8, of the Arkansas Constitution.

We now turn to McLane's primary argument that Arkansas's Unfair Cigarette Sales Act and Regulation 1988-2 are unconstitutional because the assigned presumption of predatory intent, arising from a below-cost sale under the enactments, too broadly imposes restrictions on McLane's liberty to conduct its business as it chooses. In simple terms, McLane contends that on their face, the Act and Regulation are unconstitutional because they create a presumption of illegality from the mere fact of a below-cost sale.

As previously mentioned, the Act provides that, in the absence of proof of a lesser or higher cost-of-doing-business amount, that cost amount shall be presumed to be two percent of the basic cost of cigarettes to the wholesaler plus cartage to be presumed at three-fourths of one percent of the basic cost. § 4-75-702(11)(B). The Act further states that a wholesaler's sale at less than the fixed minimum price shall be prima facie evidence of intent to injure competition, which, if unrebutted, is a criminal misdemeanor punishable by a fine of up to $500.00. *See* § 4-75-708(e) and (d). McLane submits that the fact of a below-cost sale is not enough to give rise to a presumption of predatory intent,

and such a presumption must be regarded as irrational or arbitrary, and hence unconstitutional, unless it can be said with substantial assurance that the presumed fact (of predatory intent) is more likely than not to flow from the proved fact (minimum price or below-cost sale) on which it is made to depend. *See Stone v. Lockhart*, 414 F.Supp. 1180 (E.D. Ark. 1976).

The *Wal-Mart Stores* and *Ports Petroleum* decisions relied upon by McLane are not controlling even though in both cases this court upheld below-cost sales. *Wal-Mart Stores* involved Ark. Code Ann. § 4-75-209(a)(1) of the Unfair Practices Act which makes it unlawful for any corporation doing business in this state to sell at less than cost for the purpose of injuring competitors and destroying competition. There, because Wal-Mart was selling items below cost as loss leaders, its competitors filed suit, alleging Wal-Mart's pricing was violating the Unfair Practices Act. We disagreed, stating that isolated or occasional instances of selling below cost, while predatory or illegal in nature, do not necessarily indicate a specific intent to monopolize. This court held that, if the policy of this state is to render illegal the loss-leader tactic or to recognize a prima facie case of purposeful intent to destroy competition by below-cost sales in disparate articles that are changed on a regular basis, that policy should be clearly announced by the General Assembly in appropriate legislation. In reversing the chancellor, this court ended its decision by holding § 4-75-209(a)(1) does not provide a sufficient statutory basis to support the chancery court's inference that Wal-Mart had a specific intent to destroy its competition.

■ As is obvious by its reading, the *Wal-Mart Stores* decision did not involve a sustained below-cost effort over a substantial period of time directed at a single article, as is the situation here. But, more important, the Act in *Wal-Mart Stores* did not contain a comparable statutory scheme to the one in the Unfair Cigarette Sales Act, which affords a competitor the right to establish a lower or higher minimum price. We will discuss this point further below, but first we address McLane's reliance on *Ports Petroleum*.

■ *Ports Petroleum* also fails to help McLane's cause. As mentioned previously above, *Ports Petroleum* dealt with the consti-

tutionality of Section 4 of Act 380 of the Arkansas Petroleum Trade Practices Act (APTP Act), which provided that no dealer shall make a retail sale of motor fuel at below cost, where *the effect* may injure competition. We recognized in *Ports Petroleum* that what separates predation from legitimate price cutting is the *intent* of the predator to damage and destroy competition and then recoup the losses through a greater share of the market. *Id.* at 690, citing *State v. Mapco Petroleum, Inc.*, 519 So.2d 1275 (Ala. 1987). We then adopted the following principle to use when reviewing state economic regulations for a due process violation:

> Generally speaking, the test is whether the legislation is designed to accomplish an end within legislative competence and whether the means it employs are reasonably designed to accomplish that end without unduly infringing upon protected rights . . . . Specifically, in these "sale below cost" cases, the primary issue will be whether the legislation too broadly imposes restrictions on individuals' liberty to conduct their business as they choose. If the act penalizes innocent acts not reasonably related to the problem of monopolistic practices or other deceptive, disruptive, or destructive price cutting, the act strikes too broadly.

Our court in *Ports Petroleum* found that the APTP Act did not require *predatory intent* and, in that respect, the act was overbroad and violated Arkansas's Due Process Clause. In the present case, the Unfair Cigarette Sales Act requires predatory intent, so for McLane to prevail here, it must look elsewhere than to our actual holding in *Ports Petroleum*.

McLane submits that the Act here is even more overbroad than the one in *Ports Petroleum* because, while it seems to require a showing of a below-cost sale with intent to injure competition, the Act then says a below-cost sale constitutes "prima facie evidence of intent to injure competitors." Similarly, McLane adds, the Regulation in issue provides that wholesalers are prohibited from selling cigarettes at less than minimum price, and if they do sell under such price, they will be *presumed* to have acted with purpose to injure competition. *See cf. Mott's Super Markets, Inc. v. Frassinelli*, 172 A.2d 381 (Conn. 1961). In addition, McLane argues that, because the Act and Regulation in issue here provide for fines and penalties, a person accused of selling below cost has

the burden of proving his innocence. We believe McLane's arguments are misdirected.

 Initially, we mention the well-settled rule that statutes are presumed constitutional, and if it is possible to construe a statute so as to pass constitutional muster, this court will do so. *Clinton v. Bonds,* 306 Ark. 554, 816 S.W.2d 169 (1991). However, it has also been held that a statutory presumption cannot be sustained if there is no rational connection between the fact proved and the fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience. *See Tot v. United States,* 319 U.S. 463 (1943). Where the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them, it is not competent for the legislature to create it as a rule governing the procedure of courts. *Id.* at 468. Under the "rational connection test," a permissive presumption is only required to meet a preponderance standard, and the test is satisfied and a rational connection is shown if the basic fact is more likely than not to lead to the presumed fact. *County Court of Ulster County v. Allen,* 442 U.S. 140 (1979). As previously indicated above, we agree with the Intervenors on this point. Therefore, we conclude the statutory scheme under the Unfair Cigarette Sales Act provides for the rational connection between the presumed cost-of-doing business and minimizing-price amounts in the Act and the Regulation and the presumed fact of predatory intent provided.

 The Act does not make all below-cost sales of cigarettes unlawful, but instead exempts (1) isolated transactions not made in the usual course of business, (2) clearance sales for discontinued items, (3) sales of imperfect or damaged items, (4) sales related to the liquidation of a business, or (5) sales made by a fiduciary acting under the order or direction of a court. *See* § 4-75-703(1)–(5). In addition, § 4-75-704 exempts sales below cost made to meet a competitor's prices. We believe the Intervenors are arguably correct in stating that, once the foregoing exempted sales are removed from consideration, it is rational to conclude that it is more likely than not that other below-cost sales are made for improper purposes. But other, perhaps more palatable, reasons

support the Act's and Regulation's presumed–minimum–price amounts.

The Regulation, for example, specifically reflects the wholesaler's presumed basic cost of four percent and the minimum price, which can be charged by a wholesaler for cigarettes, resulted from cost surveys and other information compiled and received by the DFA. Because wholesalers are given the opportunity to sell below these established minimums, it is, once again, reasonable to presume other below–cost sales indicate an intent to injure. Finally, but significantly, we emphasize that a wholesaler, who had a desire to charge a lesser price for cigarettes, has a right under the Act and Regulation to submit to the Director a request to charge a lesser price; the wholesaler must do so by setting forth in detail the accounting standards and methods, computations, and other relevant information, supporting the wholesaler's claimed cost of doing business. McLane, in fact, followed this procedure, and the DFA approved McLane's one–half of one percent amount until the Intervenors obtained their injunctive relief from the Chicot County Chancery Court. However, McLane never challenged the DFA's rescission of McLane's cost-of-doing business amount by raising the issue in the Pulaski County Chancery Court. Nor, to our knowledge, did McLane attempt to pursue its right to request a lesser price except by this litigation, which only seeks to set aside the Act and Regulation as being invalid. In any event, we are convinced, for the reasons stated herein, that, on their face, both the Act and Regulation afford McLane the due process it requests and are therefore constitutional.

We move now to McLane's remaining alternative arguments that Regulation 1988-2 is invalid because it is facially inconsistent with the Act and, at the very least, a question of fact exists as to whether DFA acted arbitrarily and capriciously when it promulgated the Regulation. Concerning McLane's initial point, the law is elementary that an agency has no right to promulgate a rule or regulation contrary to a statute. *See State, Ex Rel. Attorney General v. Burnett*, 200 Ark. 655, 140 S.W.2d 673 (1940), cited with approval in *Pledger v. C.B. Form Co.*, 316 Ark. 22, 871 S.W.2d 333 (1994), and *American Trucking Ass'n v. Gray*, 288 Ark.

488, 707 S.W.2d 759 (1986). McLane first points to the Act's definition of "Basic cost of cigarettes" which reads as follows:

> (1) "Basic cost of cigarettes" means whichever of the two (2) following amounts is lower, namely, the invoice cost of cigarettes to the wholesaler or retailer, as the case may be, or the lowest replacement cost of cigarettes to the wholesaler or retailer, as the case may be, within thirty (30) days prior to the date of sale, in the quantity last purchased, whether within or before the thirty-day period, less, in either of the two (2) cases, all trade discounts except customary discounts for cash, plus the full face value of any stamps or any tax which may be required by any cigarette tax act of this state or political subdivision thereof, now in effect or hereafter enacted, if not already included in the invoice cost of cigarettes to the wholesaler or retailer, as the case may be.

Ark. Code Ann. § 4-75-702(10) (1987).

McLane then draws our attention to the Regulation's definition of "basic cost," and accurately points out that the Regulation omits elements contained in the foregoing Act, and those omissions fail to make the wholesaler account for cartage or amounts received as trade discounts. Furthermore, the Regulation increases the presumption by one and one-quarter percent without any clear explanation as to how that amount was calculated or whether the cost-of-doing-business amount was determined under the Act or Regulation. McLane argues that, by enacting the Unfair Cigarette Sales Act, the General Assembly enumerated the types of costs a wholesaler should consider in order to give the seller more pricing flexibility, but by taking out the foregoing elements, DFA constricted this flexibility.

The Intervenors rejoin McLane's argument by saying that the Act provides that the presumptive cost of doing business shall be two percent plus three-quarter percent cartage in the absence of proof of a lesser or higher cost of doing business. Both Director and Intervenors summarily conclude that, because the DFA interpreted the Act to permit it to promulgate the Regulation establishing a higher cost, DFA's actions in doing so should be deemed reasonable. Clearly, this response in no way explains how DFA's Regulation and its actions fall within the language of

the Act or whether DFA followed the Act or the Regulation when it determined and increased the basic cost of cigarettes.

█ █ If DFA employed Regulation 1988-2 when it determined an increased presumptive-cost amount, then it omitted at least two core elements required by the Act. Thus, in this respect, the DFA Regulation was contrary to the Act and invalid. However, the fact that a portion of a regulation is void does not invalidate the whole regulation where such portion is distinctly separable from the remainder which in itself contains the essentials of a complete regulation. *See McClendon v. City of Hope*, 217 Ark. 367, 230 S.W.2d 57 (1950). Here, Regulation 1988-2 was promulgated for the purposes of administering and enforcing the Act, and except for the foregoing flaws of omission mentioned bearing on determining the basic cost of cigarettes, the Regulation appears consistent with the Act. Thus, the issue arises as to whether DFA's Regulation and actions may prevail even though portions of the Regulation are invalid.

█ █ To answer this question, we turn to McLane's assertion that the trial court erred in granting the Intervenors' motion for summary judgment. We believe McLane is right, based in part on the factual question discussed above — whether the DFA utilized the Act or its Regulation when it determined "basic cost." Because summary judgment is a remedy that should be granted only when it is clear that there is no genuine issue of material fact to be litigated, that remedy was not appropriate here. *See Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998); [rehearing denied, *see* per curiam March 5, 1998]. Thus, we reverse and remand this matter for further proceedings to determine under what authority the DFA determined basic cost.

Another factual issue also arises that should be considered by the trial court on remand, and that issue involves the broader question as to what method the DFA used to alter the Act, to increase the presumptive cost of doing business. McLane urges that, for DFA to make such a change to the Act by regulation, the Act requires the DFA to support the change or regulation with a cost survey in accordance with recognized statistical and cost-accounting practices.

McLane argues that there is substantial evidence that shows the DFA did not use a cost survey to determine the four percent presumptive cost of doing business. As a consequence, it argues that a fact question exists as to whether DFA relied on a cost survey when it adopted Regulation 1988-2. To support its argument, McLane reviews the testimony of various DFA officials who stated that they had never conducted cost surveys, and that no surveys were found in their files.

The Director suggests there is ample evidence in the record that cost surveys were done before Regulation 1988-2 was adopted. That evidence, however, was circumstantial and at most reveals only that a fact issue exists as to whether the Regulation was actually supported by cost-survey information.

The Intervenors' response differed from the Director's, arguing that the Act does not *require* cost surveys to be made in connection with the promulgation of regulations by the Director. Without indicating what method the Director used when establishing the four percent minimum-price markup, the Intervenors simply relate that cost surveys are not the *sole* method by which the DFA may establish a presumptive cost of doing business. Once again, the Intervenors' response serves only to show that a fact question exists concerning how the presumptive cost of doing business was established.

■ The trial court's grant of the Intervenors' motion for summary judgment is reversed and remanded for further proceedings to determine how and under what authority the DFA acted when it determined and increased the basic cost of cigarettes.