REQUESTED BY: Mary Jane Egr Edson, State Tax Commissioner
You have requested our opinion regarding the interpretation and application of the Nebraska Unfair Cigarette Sales Act, Neb. Rev. Stat. §§ 59-1501 to 59-1525 (2004) [the "Act"]. Specifically, you ask our opinion as to whether discounts offered by cigarette manufacturers to wholesale customers paying invoices by electronic funds transfer ("EFT") should be considered valid "discount[s] for cash afforded for prompt payment" which may be used to reduce the "basic cost of cigarettes" as defined in Neb. Rev. Stat. § 59-1502(8) (2004). Further, while not specifically encompassed by your request, we also consider whether the discount may be deducted from the calculation of the minimum price of cigarettes under the Act if less than all Nebraska cigarette wholesalers receive the discount.
 FACTS
To qualify for participation in a direct cigarette sales program, and thus to become a customer under contract with a cigarette manufacturer, a wholesaler must meet certain threshold requirements tied to sales of the manufacturer's product relative to the wholesaler's total cigarette sales. For example, a wholesaler must sell a certain percentage of the manufacturer's brands relative to all cigarette sales of similar brands to qualify for the manufacturer's direct sales program. The percentage of the manufacturer's brands required is relatively proximate to the manufacturer's national market share. Another requirement of the program is that the wholesaler must agree to pay the manufacturer by EFT on the date of invoice, for which the wholesaler receives a percentage off-invoice discount. We have been advised that, in the event the EFT transaction is not successfully completed on the date of invoice, the wholesaler does not receive the discount, and the manufacturer records the receivable without credit for the discount.
Each qualifying and participating wholesaler in Nebraska is offered the same percentage discount for payment of invoices by EFT. The manufacturer does not contract with Nebraska wholesalers that do not qualify or elect to qualify for the direct sales program. Such wholesalers are not customers of the manufacturer and do not purchase cigarettes directly from the manufacturer, thus making them ineligible to receive the discount.
 ANALYSIS
Neb. Rev. Stat. § 59-1503(1) states it is unlawful
 [f]or any retailer, wholesaler or other person with the intent to injure competitors or destroy or substantially lessen competition (a) to advertise, offer to sell, or sell, at retail or wholesale, cigarettes at less than cost is defined in sections 59-1501 to 59-1518, to such a retailer or wholesaler, as the case may be. . . .
The Department's regulations mirror the Act, providing that
 wholesalers, retailers, and other persons are prohibited from advertising, offering to sell or selling at retail or wholesale cigarettes at less than cost to such wholesaler or retailer . . . The term "other persons" includes cigarette manufacturers.
316 NAC 57-012.
The minimum price calculation begins with the "basic cost of cigarettes," which is defined in § 59-1502(8) as follows:
 Basic cost of cigarettes shall mean the invoice cost of cigarettes to the retailer or wholesaler, as the case may be, or the replacement cost of cigarettes to the retailer or wholesaler, as the case may be, in the quantity last purchased,
 whichever is lower, less all trade discounts and the normal discount for cash afforded for prompt payment, but excluding any special, extraordinary, or anticipatory discounts for payment within a shorter period of time than the prompt payment date required for eligibility for the normal discount for cash, to which shall be added the full value of any stamps which may be required by any cigarette tax act of this state and by ordinance of any municipality of this state in effect or hereafter enacted, if not already included by the manufacturer in his or her list price. . . .
Neb. Rev. Stat. § 59-1502(8) (2004).
The Department's regulations provide that "[c]ash discounts given to wholesalers . . . by manufacturers . . . for prompt payment of invoices reduce the invoice cost of cigarettes to the wholesaler . . . and may be reflected in a lower purchase price."316 NAC 57-017. "Cash discounts . . . mean those price reductions which are offered by a cigarette manufacturer and represent an inducement to the purchaser to encourage prompt payment." 316 NAC 57-010.12G. The regulations define "trade discounts . . . [to] mean those price reductions which are offered by a cigarette manufacturer and represent the reduction in the list price of the item being purchased." 316 NAC 57-010.12F.
The plain language of § 59-1502(8) of the Act provides that the "normal discount for cash offered for prompt payment" is deducted in determining the "basic cost of cigarettes." A "cash discount" is defined as "a discount granted in consideration of immediate payment or payment within a prescribed time." Webster's Third New International Dictionary 346 (1981). See also EH Wholesale, Inc. v. Glaser Bros., 158 Cal. App. 3d 728, 734-35,204 Cal. Rptr. 838, 843 (Cal.Ct.App. 1984) ("Discount for cash" or "cash discount" recognized as "a discount from the price of sale . . . given as a reward for prompt payment. . . ."); Black's Law Dictionary 498 (8th ed. 2004) ("Cash discount" is "[a] seller's price reduction in exchange for an immediate payment."). The Department's regulations provide that the discount must be an "inducement" for prompt payment. 316 NAC 57-010.12G. "Inducement" is defined as "[t]he act or process of enticing or persuading another person to take a certain course of action" and "[t]he benefit or advantage that causes a promisor to enter into a contract." Black's Law Dictionary 790 (8th ed. 2004).
We believe that, under the circumstances described, the EFT payments are properly characterized as a "discount for cash afforded for prompt payment" to be used in determining the "basic cost of cigarettes" under § 59-1502(8). The EFT provision assures the manufacturer prompt payment as the contract essentially requires the equivalent of a simultaneous cash payment to purchase cigarettes directly from the manufacturer. In exchange, wholesale purchasers are given a percentage discount off invoice. It seems logical to conclude that the percentage discount is part of the wholesaler's consideration for the EFT requirement. Also, it is an inducement to enter into the direct sales contracts because the discount is "a benefit or advantage" that causes a wholesaler to enter into the arrangement, and make payments by means of EFT. In the event the EFT payment is not made on the invoice date, the customer is not entitled to the discount and is liable to the manufacturer for the full invoice price. The customer may not meet the requirement and, thus, forfeit the discount. Therefore, it fits the definition of a "discount for cash afforded for prompt payment" under the Act and a "cash discount" under the Department's regulations.
Indeed, this conclusion is consistent with a relatively recent federal district court decision determining that characterizing mandatory electronic fund transfer payments by wholesalers to cigarette manufacturer as "cash discounts" was not arbitrary or unreasonable, stating that such electronic fund payments were "a reward for a prompt cash payment, albeit in the form of a compulsory electronic funds transfer. . . ." Eby-Brown Co., LLC v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection,213 F.Supp.2d 993, 1009 (W.D. Wisc. 2001). In reaching this conclusion, the court noted that "[a] payment made via electronic funds transfer is essentially the equivalent of tendering cash; the manufacturer receives payment instantaneously and can use the proceeds immediately." Id. Applying this view here, a manufacturer receives prompt payment because of the EFT requirement, as it is effectively a payment in cash. Thus, an EFT payment is correctly viewed as a "cash discount" for prompt payment because it is a discount given in consideration of immediate payment.
In addition to addressing whether a discount from invoice price granted for EFT payment qualifies as a "cash discount" for prompt payment, we believe it is also appropriate to consider whether the discount may be deducted from the calculation of the minimum price of cigarettes under the Act if less than all Nebraska cigarette wholesalers receive the discount. As noted in your request, certain cigarette manufacturers sell cigarettes to wholesalers exclusively by means of a direct sales program. As a result, not all wholesalers will qualify for the discount, since only direct purchasers are customers of these manufacturers. The question which arises is whether this practice is consistent with the Act.
On its face, the Act does not state that such a discount must be given to all wholesalers in the marketplace (including wholesalers that are not customers) to qualify as a cash discount for prompt payment with respect to the calculation of the basic cost of cigarettes. "[I]t is not for the courts to supply missing words or sentences to a statute to make clear that which is indefinite, or to supply that which is not there." State v. Hamik, 262 Neb. 761, 770, 635 N.W.2d 123, 130 (2001). The absence of any clear statutory language stating that a discount given to a manufacturer's customers must be offered to all potential customers suggests the Act should not be interpreted to include such a requirement. If the discount is given to all Nebraska wholesalers paying the manufacturer's invoices by EFT, the Act allows deduction of the cash discount from the calculation of the wholesale minimum price of the manufacturer's cigarettes in Nebraska .
The Department's regulations likewise do not state that the discount must be given to all potential purchasers. A "cash discount" is defined as "an inducement to the purchaser to encourage prompt payment." 316 NAC 57-010.12G. Thus, the regulations also do not speak to discounts being offered to non-customers or potential purchasers.
While it could be argued that a discount given to less than all is not given to encourage prompt payment, the discount is only unavailable to wholesalers that are not customers of a manufacturer. It is axiomatic that, because only customers receive invoices and pay for goods, a discount off invoice price to encourage prompt payment can only be given to customers. The EFT requirement assures prompt payment and reduces the cost of cigarettes to customers. It is, in effect, a quid pro quo for those Nebraska wholesalers who qualify or elect to qualify and participate in the manufacturer's direct sales program.
Because the language of the Act does not compel the conclusion that a discount must be given to all potential customers to be reflected in the minimum price, the only reason to refuse to do so would be that the practice is intended to injure competition. While it is not clear that this reason alone would justify excluding the discount from the minimum price calculation, we believe the practice does not evidence an intent to injure to competition prohibited by the Act.
While there are few cases interpreting state unfair cigarette sales acts in this context, other statutes designed to prevent anti-competitive business conduct suggest that programs and discounts similar to those at issue are not intended to injure competition. Such decisions suggest that a seller is free to select its customers and offer discounts only to eligible customers with whom it does business.
Under federal antitrust law, in the absence of any purpose and ability to create or maintain a monopoly, a seller or manufacturer may exercise their own independent discretion as to the parties with whom they will deal, and the seller or manufacturer may announce the circumstances under which they will refuse to sell. United States v. Colgate Co., 250 U.S. 300, 307
(1919) (Interpreting the Sherman Anti-Trust Act); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 452-53 (1922) (Applying public policy arguments from the Sherman Anti-Trust Act to the Federal Trade Commission Act to state that a simple refusal to deal is not an unfair method of competition in violation of the Federal Trade Commission Act); Reazin v. Blue Cross and Blue Shield of Kansas, Inc., 899 F.2d 951, 963 (10th Cir.), cert. denied 497 U.S. 1005 (1990) (Stating "that a business retains the right . . . to unilaterally announce the terms in which it will deal and refuse to deal with those who will not comply" (emphasis in original)); Johnson v. J.H. Yost Lumber Co., 117 F.2d 53, 61
(8th Cir. 1941) (Interpreting the Clayton Act and stating that "one engaged in private enterprise may select his own customers, and in the absence of an illegal agreement, may sell or refuse to sell to a customer for good cause or for no cause whatever"). As the Nebraska Supreme Court stated in Hompes v. B.F. Goodrich Co.,137 Neb. 84, 96, 288 N.W. 367, 373 (1939): "A person may do business with whomsoever he desires. He may likewise refuse business relations with any person whomsoever, whether the refusal is based on reason, whim or prejudice."
State unfair cigarette sales acts and federal antitrust legislation, notably the Robinson-Patman Price Discrimination Act, have similar goals, and courts have looked to federal antitrust legislation in resolving issues arising under state unfair cigarette sales statutes. Oil Well Co. v. Alabama State Dept. of Revenue, 350 F. Supp. 416, 418 (M.D. Ala. 1971), aff'd468 F.2d 1398 (5th Cir. 1972). For example, the Supreme Court of Alabama pointed to similarities between the Robinson-Patman Act and Alabama's Unfair Cigarette Sales Act in holding that the state's Act was a constitutional application of the state's police power. Simonetti, Inc. v. State of Alabama, 272 Ala. 398,400, 132 So.2d 252, 255 (Ala. 1961).
The Robinson-Patman Act provides "[i]t shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade or quality . . . where the effect of such discrimination may be substantially to lessen competition . . . or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them;. . . ." 15 U.S.C. § 13(a). The legislative history of the Robinson-Patman Act indicates that Congress passed the Act to deprive large buyers of competitive advantages over smaller buyers solely because of the large buyer's quantity purchasing ability. FTC v. Morton Salt Co.,334 U.S. 37, 43 (1948). For a pricing structure to violate the Robinson-Patman Act, there must be a reasonable possibility that a pricing structure may "lessen competition . . . or injure, destroy, or prevent competition." Id. at 46. The purpose of the Unfair Cigarette Sales Act is to prohibit unfair business practices which tend to injure competitors and destroy or substantially lessen competition in the sale of cigarettes. Neb. Rev. Stat. § 59-1503 (2004); see Arkansas Tobacco Control Bd. v. Sitton, 166 S.W.3d 550, 554 (Ark. 2004) (Stating purpose of the Arkansas Uniform Cigarette Sales Act "`[was] to promote fair and honest competition by prohibiting the sale of cigarettes below cost in the wholesale or retail trades that are made with the intent of injuring competitors or destroying or substantially lessening competition") (quoting McLane Co. v. Weiss,332 Ark. 284, 290, 965 S.W.2d 109 (1998)); Corr-Williams Wholesale Co. v. Stacy Williams Co., 622 F. Supp. 156, 159-60 (S.D. Miss. 1985 (Intent of Mississippi Unfair Cigarette Sales Act was "to encourage fair and honest competition, and to safeguard the public against unfair, dishonest, deceptive, destructive, and fraudulent business practices existing in transactions involving the sale of, offer to sell, or inducement to sell, cigarettes in the wholesale and retail trades in [the] state.").
The text of the Robinson-Patman Act itself recognizes one's right to select one's own customers, stating "[t]hat nothing herein shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade."15 U.S.C. § 13(a). Actionable price discrimination does not arise until two completed transactions occur; thus, a refusal to sell cannot constitute a violation of the Robinson-Patman Act. Becker v. Safelite Glass Corp., 244 F. Supp. 625, 635 (D. Kan. 1965).
A discount made available to less than all customers with whom a seller has chosen to do business does not necessarily result in an impermissible injury to competition prohibited by the Robinson-Patman Act. So long as an offer for a discount is functionally available to all customers the seller chooses to sell to, there is no intent to injure competition even if the offered discount is not practically available to all. In FTC v. Morton Salt Co. 334 U.S. 37 (1948), the U.S. Supreme Court held that a volume based discount with purchase requirements set so high that small purchasers could not qualify for the discount constituted price discrimination. Id. at 44. The Court noted that, while the discounts were "theoretically" equally available to all customers, "functionally they [were] not. . . ." Id. at 43. Consistent with this view, courts have recognized that "[t]he practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson-Patman violation if the concessions are available equally and functionally to all customers." Bouldis v. U.S. Suzuki Motor Corp., 711 F.2d 1319, 1327 (6th Cir. 1983); see also Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co., No. 2:03-CV-30, 2005 U.S. Dist. WL 1325012 at *4 (E.D. Tenn. June 3, 2005). Thus, a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available. Bouldis v. U.S. Suzuki Motor Corp., 711 F.2d at 1327; Smith Wholesale Co. v. R.J. Reynolds Tobacco Co., No. 2:03-CV-30, 2005 U.S. Dist. WL 1325012 at *4 (quoting Bouldis).
A market share based discount program such as employed by various cigarette manufacturers is not based on making an unattainable minimum volume of purchases and is functionally available as a result. Therefore, it is not the type of program likely to raise an issue central to the concern underlying Robinson-Patman, injury to competition. Small wholesalers and retailers, whom fair trade and antitrust statutes were intended to protect, are not disadvantaged by a market share formula. See Edward J. Sweeney Sons, Inc. v. Texaco, Inc., 637 F.2d 105,120-21 (3rd Cir. 1980), cert. denied 451 U.S. 911 (1981) (Holding that a pricing formula based on the purchaser's location did not violate the Robinson-Patman Act, because it was functionally available to all purchasers as distinguished from quantity based discounts); Krist Oil Co., Inc. v. Bernick's Pepsi-Cola of Duluth, Inc., 354 F. Supp.2d 852, 857 (W.D. Wis. 2005) (Distinguishing pricing scheme where wholesale case prices varied according to chain's retail pricing of the case of soda from a volume based discount). Courts have held that there is no price discrimination when the buyer's ability to take advantage of the best discount was within the control of the buyer for reasons such as poor credit, management choices, decisions not to hold inventory, or particular marketing strategies. Shreve Equipment, Inc. v. Clay Equipment Corp., 650 F.2d 101, 105-06 (6th Cir.), cert. denied 454 U.S. 897 (1981); Edward J. Sweeney Sons Co. v. Texaco, Inc., 637 F.2d at 121; Chapman v. Rudd Paint Varnish Co., 409 F.2d 635, 643 (9th Cir. 1969); Smith Wholesale Co. v. R.J. Reynolds Tobacco Co., No. 2:03-CV-30, 2005 U.S. Dist. WL 1325012 at *4.
In Smith Wholesale Co. v. R.J. Reynolds Tobacco Co., the court found that a cigarette manufacturer's "market share" direct sales program did not injure competition and did not constitute impermissible price discrimination in violation of the Robinson-Patman Act. In that case, the plaintiff, Smith Wholesale Co., argued that the R.J. Reynolds ["RJR"] direct sales program violated the Robinson-Patman Act because the discounts offered to program participants (who qualified based on the wholesaler's market share) were not offered to all wholesalers. The court disagreed, holding that RJR's pricing plan, granting discounts based on a percentage comparison of the distributor's sales of RJR's savings brands to its sales of non-RJR savings brands, was functionally available to all distributors and therefore did not violate the Robinson-Patman Act. 2005 U.S. Dist. WL 1325012 at *9. Similarly, the U.S. District Court in the Northern District of Illinois held that a market share based rebate pricing plan was functionally available, because the plaintiff could have received the greater rebate, but, based on its business judgment, decided not to take advantage of the rebate. American Tara Corp. v. Int'l Paper Co., No. 79C1470, 1981 U.S. Dist. WL 375752 at * 3 (N.D. Ill. July 30, 1981) (Explaining "that functional availability breaks the causal connection between the defendant's actions and the injury to competition, a connection which must be proven in order to recover in an antitrust action."); see also Smith Wholesale Co., Inc. v. Philip Morris USA Inc., No. 2:03-CV-221, 2005 U.S. Dist. WL 1981452 (E.D. Tenn. Aug. 17, 2005) (holding that Philip Morris' market share based discount was functionally available to all distributors and therefore not price discrimination in violation of the Robinson-Patman Act).
Similar to Smith Wholesale Co. v. R.J. Reynolds Tobacco Co, Smith Wholesale Co., Inc. v. Philip Morris USA Inc., and American Tara Corp. v. Int'l Paper Co., the "cash discount" given by a cigarette manufacturer to wholesalers qualifying for the manufacturer's direct sales program appears to be functionally available to all purchasers because the discount is not quantity based and, as a result, does not discriminate against smaller purchasers. Due to business and marketing decisions, purchasers may choose not to engage in business practices that would qualify them for the discount, but the purchaser's business decision does not render the discount functionally unavailable and therefore does not constitute an injury to competition prohibited by the Act.
These cases indicate that a discount need not even be given to all customers to pass muster under statutes designed to prevent injury to competition. Here, a cigarette manufacturer's off-invoice discount is given equally to all its Nebraska customers and is also functionally available to non-customers, whose choice of business practices, rather than anti-competitive conduct, has excluded them from the manufacturer's direct sales program.
There is nothing unique to the Act that would compel a different conclusion. In fact, refusing to include the cash discount in the cost calculation could actually result in an injury to competition, contrary to the goals of the Act. If a cigarette manufacturer engages in sales through a direct sales program to qualifying wholesalers, then non-qualifying wholesalers must obtain that manufacturer's product from participants in the direct sales program. Pursuant to Neb. Rev. Stat. § 59-1507 (2004):
 When one wholesaler sells cigarettes to any other wholesaler, the former shall not be required to include in his selling price to the latter cost to the wholesaler, as provided by section 59-1505, except that no such sale shall be made at a price less than the basic cost of cigarettes, as defined in section 59-1502. . . .
If participants in a manufacturer's direct sales program are given a percentage discount for EFT payment, and that discount is not included in the calculation of the basic cost of cigarettes, the participating wholesaler will be prohibited from passing along the discount to other wholesalers, placing some wholesalers at a competitive advantage to other wholesalers in the market place. "[I]n construing statutes, implications will not be indulged which are necessarily contrary to and incompatible with the spirit and purpose of the enactment being construed." Bituminous Casualty Corp. v. Deyle, 234 Neb. 537, 555,451 N.W.2d 910, 921 (1990). The statute should not be interpreted in a manner which would preclude recognition of a "cash discount" for EFT payments in calculating the basic cost of cigarettes, as such a construction could potentially produce a result contrary to the statute's purpose.
 CONCLUSION
In conclusion, a cigarette manufacturer's discount for EFT payment is a discount in consideration of immediate payment and thus is a proper "discount for cash afforded for prompt payment" which reduces the "basic cost of cigarettes" defined in §59-1502(8). The discount is only given for valid EFT payment on the date of invoice and not given if the EFT requirement is not met for any reason. A discount offered to customers paying invoices by EFT should therefore be subtracted from the calculation of the basic cost of cigarettes under the Act. Further, the plain language of the Act does not require that a discount be offered to non-customers of a manufacturer. The "market share" based direct sales programs and accompanying discounts provided by cigarette manufacturers are functionally available to all wholesalers. As many courts have determined, such a practice does not cause injury to competition, and is thus not illegal under the federal antitrust laws, which are analogous to fair trade statutes such as the Act. Interpreting the Act otherwise may result in consequences contrary to the stated purpose of the Act. Therefore, the off-invoice discount for EFT payment should be subtracted from the Department's calculation of the minimum price of a manufacturer's cigarettes in Nebraska.
 Very truly yours, JON BRUNING Attorney General
 L. Jay Bartel Assistant Attorney General
Approved:
 ______________________________ Attorney General