ARKANSAS HEALTH SERVICES AGENCY and Arkansas
Health Services Commission; Arkansas Health Care Association
*v.* DESIDERATA, INC.

97-259                                          958 S.W.2d 7

Supreme Court of Arkansas
Opinion delivered January 22, 1998

*Winston Bryant*, Att'y Gen., by: *Vicki M. Pickering*, Asst. Att'y Gen., and *Glen Hooks*, Asst. Att'y Gen., for appellants.

*Friday, Eldredge & Clark*, by: *Bill S. Clark*, for appellee.

*Meeks & Jernigan, P.A.*, by: *George O. Jernigan, Jr.*, for intervenor-appellant.

Tom Glaze, Justice. In 1994, Desiderata filed an application with the Arkansas Health Services Agency, requesting a permit of approval for a new seventy-bed nursing home to be constructed near Maumelle. Desiderata's application provided that the proposed home is intended to serve developmentally disabled and mentally retarded elderly persons, as well as those diagnosed with Alzheimers and HIV. Its application also proposed to serve members of what is referred to as the normal segment of the elderly community needing long-term care.

The Agency denied Desiderata's application, stating that the application failed to meet all of the required criteria under Ark. Code Ann. § 20-8-106(b) (Repl. 1991). Desiderata appealed the Agency decision to the Arkansas Health Services Commission, and after a public hearing on November 28, 1994, the Commission voted to affirm the Agency.[1] Upon petitioning for judicial review, the trial court reversed the Commission's decision, and in

---

[1] The Commission without a hearing had adopted the Agency's ruling earlier on May 24, 1994, but the Commission reconsidered its decision upon Desiderata's request.

doing so, held the methodology employed by the Agency and Commission was arbitrary and capricious and violated the Equal Protection Clause. The trial court further ruled the Commission's decision was not supported by substantial evidence. We hold the trial court erred.

We first mention our inability to reach, at least directly, the trial court's Equal Protection Clause ruling, because that constitutional issue was never raised before the Commission. In this respect, we cite the settled law in *Hamilton v. Jeffrey Stone Co.*, 6 Ark. App. 333, 641 S.W.2d 723 (1982), where the court of appeals adopted the rule that, even though the Workers' Compensation Commission may not have the authority to declare statutes unconstitutional, such constitutional issues should first be raised at the Administrative Law Judge or Commission level because such issues often require an exhaustive analysis that is best accomplished by an adversary proceeding, which can be done only at the hearing level. The *Hamilton* court concluded that requiring constitutional issues to be considered by the Commission can assure such issues will be thoroughly developed before an appellate court is asked to rule on a statute's validity.[2] The rule in *Hamilton* has been consistently followed by the court of appeals, *see Green v. Smith & Scott Logging*, 54 Ark. App. 53, 54, 922 S.W.2d 746 (1996), and we believe the rule is a sound one and applicable here.

Desiderata did not raise its Equal Protection Clause argument until its appeal to circuit court; thus, under the *Hamilton* rule, it is barred from arguing that issue now. However, even if Desiderata had raised equal protection as an argument at the administrative level, this court has held that establishing that different applicants are treated differently does not prove the denial of equal protection. *Second Baptist Church v. Little Rock Historic Dist. Comm'n*, 293 Ark. 155, 732 S.W.2d 483 (1987). And while Desiderata argues the Health Services Agency and Health Services Commission have failed to give a sufficient reason or rationale for treating established nursing homes more favorably than new ones,

---

[2] This court later held the court of appeals was obliged to decide the constitutional issues after the issues had been argued and briefed before the Commission and court of appeals. *Hamilton v. Jeffrey Stone Co.*, 293 Ark. 499, 739 S.W.2d 161 (1987).

we disagree. However, for present–case analysis and decision making, the fundamental issues actually before us to be decided are (1) whether the Commission's methodology and actions were arbitrary and capricious, and (2) whether its decision is supported by substantial evidence. *See Arkansas Dep't of Human Servs. v. Kistler*, 320 Ark. 501, 898 S.W.2d 32 (1995). In this respect, our review is not directed toward the circuit court but toward the Agency and Commission decisions, recognizing that administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts to determine and analyze legal issues affecting their agencies. *Id.*

In the initial review of Desiderata's application, the Agency considered the four factors set out in § 20-8-106(b), which read as follows:

(1)   Whether the proposed project is needed or projected as necessary to meet the needs of the locale or area in terms of the health care required for the population or geographic region;

(2)   Whether the proposed project can be adequately staffed and operated when completed;[3]

(3)   Whether the proposed project is economically feasible; and

(4)   Whether the project will foster cost containment through improved efficiency and productivity.

As related to factor (1) the Agency determined that its population–based methodology requires a "need" for additional beds *and* an "occupancy rate" for Pulaski County of at least 94.5% for the previous calendar year. The Agency found that Desiderata had not demonstrated a "need" in the county or shown that the occupancy rate was satisfied. Specifically, it found an excess of fifty-one beds over the county's need, and the county's occupancy rate fell short of the required 94.5% rate. Other concerns of the Agency listed under the "need" factor were that, for the calendar year used under its methodology policy, 389 beds were empty on

---

[3] The Agency and Commission did not question Desiderata's ability to staff and operate its proposed facility, so only three of the four factors are in issue.

any given day in the county, and that 222 approved but still unlicensed beds existed in the county.[4]

■ At the Commission hearing, Desiderata did not suggest that the Agency's methodology policy be changed, but it did contend the Agency's need and occupancy-rate determinations were erroneous. Although Desiderata argues at length that the Agency Director, Orson Berry, had failed to account for some 94 beds in his calculation of bed needs, it concedes that it must also satisfy the methodology county occupancy rate of 94.5%. As a consequence, even with Desiderata's suggested corrections in the counting of beds, the Agency occupancy rate remained at 85.04%, or 9.46% below the required occupancy rate. Thus, the crux of Desiderata's argument turns on its contentions that the Agency and Commission erred in calculating the 85.04% rate figure for Pulaski County.

■ In its brief, Desiderata points out that the 85.04% Pulaski County occupancy rate was calculated by including private-pay nursing homes and homes with Medicaid and Medicare residents. It argues that private-pay homes should not be included because of their historically low occupancy rates and their ability to manipulate the rate. The trial court agreed with Desiderata's argument, relying in part upon the testimony of Larry Taylor, a health-planning consultant, who, among other things, said that if a private-pay nursing home wanted to change its method of marketing, that home could change its occupancy rate. However, in relying on this portion of Taylor's testimony, the trial court and Desiderata ignored other pertinent parts. For example, Taylor related that Medicaid and private-pay beds are licensed by the same authority and have to meet the same standards. He stated private-pay beds have always been counted in health planning in this state and others, and if you fail to do so, the state will immediately have "too many beds because anybody that wants to do private pay can just come in and start building nursing homes." Taylor disagreed, too, with Desiderata's speculation that, by counting private-pay homes, Pulaski County could never reach

---

[4] These additional findings were made since the Agency is not limited only to the four considerations named in § 20-8-106(b).

the Agency's methodology occupancy rate of 94.5%. Also significant, while Desiderata introduced evidence reflecting private-pay facilities in Pulaski County that have low occupancy rates, the same proof shows that five of those homes' rates had increased substantially over a three- or four-year period, and one of them reported an occupancy rate as high as 93.53%.

Desiderata further questions the accuracy of the Agency's occupancy-rate calculations, urging that the 85.04% figure was erroneously reached by using unreliable data that the Agency obtained from a telephone survey of the private-pay homes. In other words, while the Agency obtains occupancy-rate information for Medicaid-certified nursing homes from the Department of Human Services Office of Long-Term Care, it acquires such occupancy data from private-pay facilities by telephone survey. This telephone data, Desiderata contends, is unreliable and therefore fails to support the Agency's rate calculations. Desiderata and the trial court are wrong.

■ ■ In *Arkansas Health Planning & Development Agency v. Hot Spring County Memorial Hospital*, 291 Ark. 186, 723 S.W.2d 363 (1987), this court held that telephone survey information, and other like data, can constitute substantial evidence in an administrative hearing. And while such occupancy-rate data might be obtained in another manner, Taylor testified that the use of a telephone survey is the only objective way for the Agency to obtain such data from private-pay facilities. Other than Desiderata's attorney's opening statement before the Commission, Desiderata presented no evidence that questioned the accuracy of the Agency's data.

■ From the foregoing, we conclude substantial evidence was more than ample to uphold the Commission's occupancy-rate calculation of 85.04% and its finding that the required 94.5% county occupancy rate was not shown. And while Desiderata does not appear to challenge the Agency's findings that Desiderata's proposed project was not economically feasible and did not foster cost containment as required under § 20-8-106(b)(3) and (4), we believe the record sufficiently supports those findings as well.

In addressing the "economically feasible" consideration, the Agency found Desiderata's profit estimates appeared unrealistically optimistic for several reasons. For instance, Trudy James, the Executive Director of the Regional AIDS Interfaith Network, RAIN-Arkansas, testified that it has been difficult to find nursing homes that would accept AIDS patients due to the fear of mixing AIDS patients with other patients. However, Dr. Carl Johnson, a member of the Commission and a physician who has worked with just such a mix, stated that a problem does exist when mixing or interacting AIDS patients with demented ones because of potential health and legal concerns if there ever was an interaction between the two. The Agency questioned whether a facility could attract private-pay patients who are financially able to pay more than Medicaid patients. Taylor further pointed out that Desiderata had not identified special staff personnel that would focus on the combined groups to be served, and that, in serving special groups, Desiderata had not shown a sufficient population in any of those groups to justify the existence or financial feasibility of a seventy-bed nursing home. And finally, the Agency found that, because there presently existed 222 approved but unlicensed beds that have not, as yet, entered the market place, the Agency doubts the financial feasibility of a new nursing home.

The final consideration was the Agency's finding that Desiderata's proposed facility failed to promote cost containment or improve efficiency or productivity. Desiderata offered no evidence showing cost containment would result from its proposed project. Taylor, however, testified Desiderata's land site was in an unincorporated area located three miles from Maumelle, and municipal services such as for water, sanitation, fire protection, and ambulance needs are not readily available. The Agency also opined that a county with low occupancy and 222 beds yet to enter the market place could not improve the efficiency or productivity of existing services.

In conclusion, we address Desiderata's charge that the Agency's methodology is arbitrary because an "established" nursing home that has an occupancy rate of 96% for the year can obtain up to 10% of their licensed capacity or an additional ten beds (whichever is greater) even though the county occupancy

rate of 94.5% or a need is not shown. In short, Desiderata submits if no county need can be shown under the Agency's population-and-utilization-based methodology, then all applicant requests for new beds should be denied. As a part of the same argument, Desiderata also claims the Agency's methodology arbitrarily favors established nursing homes by ranking nursing home applicants as follows:

> 1. Applicants whose facility had a 96% occupancy rate or greater for the previous calendar year. These applicants would be eligible for 10% increase in their licensed capacity or 10 beds whichever is greater.
> 2. Applicants who propose to replace older facilities. These applicants would be eligible for a 20% increase in their licensed capacity.
> 3. Applicants who have a facility proposing to expand to 70 beds would be eligible to expand to 70 beds. Applicant facilities with less than 70 beds and more than 60 licensed beds would be eligible for a 10 bed increase.
> Applicants qualifying under [1] who also propose to add more than 10% or 10 beds will have a preference (for up to 35 beds) over applicants proposing a new facility.

The Agency and Commission counter Desiderata's arguments, stating that there are valid reasons for providing a preference to established nursing homes. They offer, once again, Taylor's testimony to support their position. Taylor explained that there are counties in the state where there are only two nursing homes. He said that you may have one operator who provides excellent services and maintains a 96% occupancy, but the second one may offer very poor quality care, and have only a 60% occupancy rate. As a consequence, the county occupancy rate could never meet the established 94.5%. The Agency decided that, if a facility maintained a 96% occupancy rate for a year, it would enable that facility to expand in order to allow patients a choice of a better facility. Taylor added that the Agency had not acted arbitrarily in utilizing the 96% rule, since he knew of only one nursing home in Pulaski County whose application had been approved under the rule.

The Agency and Commission further justify the preference extended to existing facilities because the methodology

fosters cost containment and aids in the control of spiralling health-care costs. They cite the case of *Statewide Health Coordinating Council v. General Hospitals of Humana, Inc.*, 280 Ark. 443, 660 S.W.2d 906 (1983), a case involving prior law governing certificates of need to hospitals, where the court discussed the economic reasons for regulating the health industry. There the court noted that the policy of restricting hospital construction stems from the belief that competition among hospitals, unlike competition in the market place, does not reduce the cost of in-patient hospital services to the consuming public. *Id.* Based on this reasoning, the Agency and Commission maintain that the State's permit of approval requirement for the construction or expansion of nursing home facilities is based on the State's interest in controlling health-care costs and that the overbuilding of facilities can be responsible for high costs of medical services.

██ ██ Although the trial court in its order expressly stated that it considered much of Taylor's testimony improper and the "need" evidence suspect and unreliable, we are unable to say the evidence set out and discussed hereinabove was not substantial or failed to support the Commission's decision. We are reminded that the rule is well settled that this court must affirm an agency's decision if there is substantial evidence to support it, and in reviewing the record, the evidence is given its strongest probative force in favor of the agency's ruling. *Files v. Arkansas State Highway & Transp. Dep't*, 325 Ark. 291, 925 S.W.2d 404 (1996); *Arkansas Dept. of Human Servs. v. Kistler, supra.* Here, the trial court, we believe, wrongly discounted, and at times altogether dismissed the consideration of, proper evidence presented to the Commission, and erred in substituting its own judgment for that of the Agency and Commission. *See Arkansas Contractors Licensing Bd. v. Butler Constr. Co.*, 295 Ark. 223, 748 S.W.2d 129 (1988). Consequently, we reverse and remand the trial court's decision.