ARKANSAS HEALTH SERVICES COMMISSION;
Arkansas Health Services Agency; Sandra Winston,
in Her Official Capacity as Director of the
Arkansas Health Services Agency, *v.*
REGIONAL CARE FACILITIES, INC.

01-1106                                   93 S.W.3d 672

Supreme Court of Arkansas
Opinion delivered December 19, 2002

*Mark Pryor*, Att'y Gen., by: *Warren T. Readnour*, Ass't Att'y Gen., for appellant.

*Pam Roberts*; and *Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *Sam Hilburn*, for appellee.

TOM GLAZE, Justice. The State has appealed from the trial court's granting of summary judgment in favor of Regional Care Facilities, Inc., a Benton County-based company that applied for a permit to construct a nursing home in Benton

County. This appeal presents a question of whether a rule adopted by the Arkansas Health Services Commission constitutes special or local legislation in violation of Ark. Const. amend. 14; our jurisdiction arises under Ark. Sup. Ct. R. 1-2(a)(1).

The Commission is vested with the authority to approve permits of approval for the construction of new nursing homes in the state. *See* Ark. Code Ann. § 20-8-104(d) (Repl. 1991). In order to determine whether new nursing home beds are needed in a particular county, the Commission has adopted certain "methodologies" that look at populations and occupancy rates in the county. At a meeting on March 19, 1999, the Commission adopted an "emergency rule" to create a one-time exception to its population-based methodology. Prior to the change, this population-based methodology allowed the Commission to determine the need for additional nursing home beds merely by determining the difference between the total beds that exist for an area and the projected need for beds in the future. For a "need" for new nursing home beds to exist, a county's population figures must show a projected bed need, and the occupancy levels of existing facilities in the county must show that the facilities have been, on average, at least 94.5% occupied during the previous fiscal year.

At least part of the reason for adopting the March 1999 emergency rule was to respond to repeated requests for additional nursing home beds in the Bella Vista area of Benton County. Residents of Bella Vista, members of the Bella Vista Long Term Care Committee, representatives of Washington Regional Medical System (a Benton County-based nursing home company doing business as Bella Vista Health Care) and members of the Arkansas General Assembly from Benton and Washington Counties had all made such requests. Indeed, from 1996 until the filing of this lawsuit, Washington Regional had worked in conjunction with the Bella Vista Long Term Care Committee to seek a permit for Washington Regional to construct a new nursing home in Benton County. In fact, Washington Regional in 1996 had applied for, and the Commission granted, a permit to construct a new nursing home, but the Commission's decision to award it a permit was later reversed by a Pulaski County court in 1997.

Thereafter, Washington Regional submitted a proposal to the Commission in the form of a new rule change that would create an exception whereby the 94.5% occupancy requirement could be disregarded. Washington Regional's proposal was subsequently adopted by the Commission in March 1999, and that new rule permitted the occupancy requirement to be disregarded one time in order to approve a new 70-bed facility in a county where the projected need for the county exceeded the "existing" (i.e. licensed and approved) beds by 150 or more beds. When this new rule was adopted in March 1999, the Commission believed that Benton County was the only county in the state that fell within the provisions of the new rule. The Commission later learned that other counties could comply when, in May of 1999, two separate applicants applied to construct new nursing homes in Garland and Pulaski counties.

In June of 1999, the Commission repealed the March 1999 emergency rule on the expressed grounds that an improper notice had been given.[1] After repealing the March 1999 rule, the Commission then adopted a modified version on August 19, 1999, which read as follows:

> The Commission may disregard the overall county occupancy one time in order to approve a 70-bed facility in a county where the projected need for the county *exceeds the "existing"* (i.e. licensed and approved) *beds by 250 or more beds. This rule could be used every three (3) years.*

(Emphasis added.) The effect of this change was to make the rule applicable only to Benton County, since that county was the only one whose projected need exceeded 250 or more beds. In this respect, the Commission's August 1999 rule excluded Garland and Pulaski counties by increasing the earlier 150-bed requirement to 250 or more beds. It also added that the rule could be used

---

[1] In *Wagnon v. Arkansas Health Services Agency*, 73 Ark. App. 271, 40 S.W.3d 849 (2001), the court of appeals affirmed the Commission's decision that the emergency rule adopted in March of 1999 was invalid. That lawsuit was filed by a Garland County resident who applied for a permit to construct a nursing home on May 3, 1999. The reason that the court held the rule invalid was because the emergency rule failed to state its reasons for finding that there was an "imminent peril to the public health, safety, or welfare." *Wagnon*, 73 Ark. App. At 372; Ark. Code Ann. § 25-15-204(f) (Supp. 1999).

only every three years. The Commission expressed no explana-
tion for this increase in beds. In sum, under the permanent
August 1999 version of the rule, only one new 70-bed facility
could be added in a county showing a need for over 250 additional
beds.

Prior to the Commission's adoption of the August 1999 rule,
Regional Care Facilities, Inc. had filed an application for a permit
to construct a new nursing home in the Bella Vista area of Benton
County, but the Commission voted to deny Regional Care's
application in May of 1999.[2] In early November of 1999, Wash-
ington Regional submitted an application for a permit of approval
under the August 1999 rule, but prior to the Commission's acting
on that application, Regional Care filed a complaint on Novem-
ber 30, 1999, seeking a declaratory judgment to have the August
1999 rule declared invalid as special or local legislation.[3] In the
complaint, Regional Care asserted that the issuance of a permit to
Washington Regional would affect and jeopardize the feasibility
and existence of Regional Care's proposed facility; for that reason,
Regional Care sought both a declaration that the new rule was
invalid and a preliminary injunction restraining the Commission
from applying the rule and accepting or acting upon applications
under the rule.

The trial court denied the preliminary injunction, finding
that Regional Care had failed to establish that it would be irrepa-
rably harmed in permitting the Commission to hear and consider
Washington Regional's application. Subsequently, Regional Care
filed a motion for summary judgment, contending that it was enti-
tled to a judgment as a matter of law on the basis that the Com-
mission had acted arbitrarily and in violation of Ark. Const.
amend. 14, which prohibits special and local legislation.

The circuit court granted Regional Care's summary judg-
ment motion, finding .there was no rational basis for excluding

---

[2] In January of 2000, a Pulaski County court reversed the Commission's denial of
Regional Care's application and awarded Regional Care a permit to construct a new
nursing home in Bella Vista.

[3] Neither Regional Care nor any nursing home other than Washington Regional
had applied for a 70-bed permit when this suit was filed.

from the rule other counties, such as Garland and Pulaski, that showed a population-based net numerical need but low occupancy. The court further noted that, if the Commission's recent August 1999 rule was intended to meet a need for additional beds, then there was no rational basis for excluding Garland and Pulaski and other counties showing a net numerical need from the rule. The Commission has appealed the trial court's order, arguing the court erred in two respects: 1) in concluding that the rule was special or local legislation; and 2) in considering the deposition testimony of members of the Commission regarding their opinions bearing on the intent and purpose of the rule.

■ The first issue we address is whether the amended rule adopted by the Commission in August of 1999 constitutes special or local legislation in violation of Amendment 14 to the Arkansas Constitution. This Amendment states that "[t]he General Assembly shall not pass any local or special act." In *Arkansas Game & Fish Comm'n v. Clark*, 192 Ark. 840, 96 S.W.2d 699 (1936), this court determined that the General Assembly could not grant a state agency the authority to promulgate regulations contrary to Amendment 14.

■■ When considering the validity of a regulation, the court must give the regulation the same presumption of validity as it would a statute. *National Park Med. Ctr., Inc. v. Arkansas Dep't of Human Servs.*, 322 Ark. 595, 911 S.W.2d 250 (1995). In reviewing the adoption of regulations by an agency under its rule-making procedures, a court is limited to considering whether the administrative action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Department of Human Servs. v. Berry*, 297 Ark. 607, 764 S.W.2d 437 (1989) (citing *Arkansas Pharmacists Assoc. v. Harris*, 627 F.2d 867 (8ᵗʰ Cir. 1980)). A court will not attempt to substitute its judgment for that of the administrative agency. *Id.* (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)). A rule is not invalid simply because it may work a hardship, create inconveniences, or because an evil intended to be regulated does not exist in a particular case. *Id.*

An act is special if, by some inherent limitation or classification, it arbitrarily separates some person, place, or thing from those upon which, but for such separation, it would operate, and the legislation is local if it applies to any division or subdivision of the state less than the whole. *Hall v. Tucker*, 336 Ark. 112, 983 S.W.2d 432 (1999); *Fayetteville Sch. Dist. v. Arkansas State Bd. of Educ.*, 313 Ark. 1, 852 S.W.2d 122 (1993); *Owen v. Dalton*, 296 Ark. 351, 757 S.W.2d 921 (1988). Merely because a statute ultimately affects less than all of the state's territory does not necessarily render it local or special legislation. *Boyd v. Weiss*, 333 Ark. 684, 971 S.W.2d 237 (1998); *Littleton v. Blanton*, 281 Ark. 395, 665 S.W.2d 239 (1984). Instead, we have consistently held that an act of the General Assembly (or, as here, an administrative agency) that applies to only a portion of the state is constitutional if the reason for limiting the act to one area is rationally related to the purposes of that act. *McCutchen v. Huckabee*, 328 Ark. 202, 943 S.W.2d 225 (1997). Although a law may be limited in effect only to a few classifications, it is not necessarily special or local legislation if the classification is not arbitrary and bears a reasonable relation to the purpose of the law. *Foster v. Jefferson County Bd. of Election Comm'rs*, 328 Ark. 223, 944 S.W.2d 93 (1997).

Here, the State concedes that the application of the rule affects only Benton County. The question, therefore, is whether this separation of Benton County was done arbitrarily. Other cases striking statutes as special or local legislation have discussed what constitutes an arbitrary classification. For example, in *Littleton v. Blanton, supra*, the law in question, Act 616 of 1975, provided that any municipality of the first class located in any county having a population of not less than 26,500 nor more than 28,000 according to the 1970 Federal Census could establish a municipal court with the same jurisdiction as courts of the Justice of the Peace, which jurisdiction shall be coextensive with the township. Further, the mayor of the municipality could designate any qualified elector of the township, or any licensed attorney, to serve as judge of the court. The stated purpose of the Act was to "provide an alternative procedure for the creation of the municipal court by a city of limited financial means and lacking a local attorney." *Littleton*, 281 Ark. at 397.

■ The *Littleton* court reversed the lower court's finding that Act 616 did not violate the Constitution. Noting that the Act could only apply to Marked Tree, in Poinsett County, the court first cited the rule that "generality ends and specialty begins where the class established by the Act has no reasonable relation to the purpose or subject matter of the enactment and omits from its operation persons or areas which would fall naturally into the class to which the act is limited." *Id.* at 399. The court then went on to conclude that Act 616 was local because of its arbitrariness, writing as follows:

> *Act 616 can never apply to any county other than Poinsett County.* The announced purpose of the Act is to enable a city of the first class but of limited financial means and lacking a local attorney an alternative means of creating a municipal court; but *a population classification applying only to a county of not less than 26,500 nor more than 28,000 according to the 1970 Federal Census is arbitrary and has no reasonable relationship to cities of limited financial means or lacking a local attorney.* According to the 1970 census, Marked Tree had a population of 3,208; there were 32 municipalities in Arkansas with a population of between 2,500 and 5,000 in 1970. There could well have been cities of limited financial means and lacking a local attorney in counties other than Poinsett County.
>
> \* \* \* \*
>
> Whether or not Act 616 was passed for the benefit of [the then-sitting judge in Marked Tree], limiting the Act to Poinsett County is arbitrary and bears no reasonable relation to the announced intention of the Act to provide an alternate procedure for the creation of a municipal court by a city of limited financial means and lacking a local attorney. *If there was in fact a real need for such a court, it is arbitrary and unreasonable to assume that such a need existed only in Poinsett County.* Act 616 is a shining example of the type of local and special legislation which the people sought to stop by the adoption of Amendment 14.

*Id.* at 404 (emphasis added).

■ Another case where an act was found arbitrary and special legislation is *Knoop v. City of Little Rock*, 277 Ark. 13, 638 S.W.2d 670 (1982). There, this court invalidated an act that

directed cities with populations over 100,000 and a city manager form of government to elect the mayor by a majority vote. Only Little Rock met this criteria. The chancellor had ruled that the purpose of the act was to make the legislative body and mayor of larger cities more responsive to the voters, and that the Act was therefore not special or local legislation. This court, however, reversed, emphasizing that, in determining whether an act is general, local, or special, we "look to its substance and practical operation, rather than to the form or phrasing of the act; otherwise, the prohibition against special and local legislation . . . could easily be circumvented." *Knoop*, 277 Ark. at 15. Because the act granted to one city powers in the election of its governing officials not granted to other cities with the same form of government, this court was unable to discern that there was any reasonable connection between a city having a population in excess of 100,000 and the desirability of the act's electoral provisions. On this question, the court wrote as follows:

> [The powers of a mayor] are the same whether the mayor is selected by the directors or by direct election with a majority vote. In the absence of reasonable statutory difference in the powers or functions of the mayors of cities of different sizes, we cannot, although the act is accorded presumptive validity, find any reasonable basis for granting to one city but not others the power of directly electing its mayor and holding runoff elections for the positions of mayor and city directors two weeks after the general election.

*Id.* at 16–17.

Further, our court in *Humphrey v. Thompson*, 222 Ark. 884, 263 S.W.2d 716 (1954), invalidated Act 273 of 1953, because there was no rational basis for singling out one particular county. In *Humphrey*, the General Assembly passed Act 273, which was intended to establish a vocational school "in all counties having a population of less than 6,000 according to the 1950 Census." Perry County was the only county that fit within that classification. Testimony was introduced in the case that showed there was no reason why Perry County, and not other counties, should have been singled out for the construction of a vocational school; one witness testified that he knew of "no reason for Perry County

having any special need over these counties [such as Montgomery County, which had a population of 6,680] that have a few more population than Perry County." *Humphrey*, 222 Ark. at 889. Because the population of a county afforded no basis on which to justify the classification, and because the "local act *affects only one locality arbitrarily selected*," the court held that Act 273 violated the prohibition against special and local legislation. *Id*. at 890 (emphasis added).

However, we also are mindful of cases where legislation that obviously applied to only one locality was held valid, because a legitimate reason existed for singling out one particular city. For example, in *Boyd v. Weiss*, 333 Ark. 684, 971 S.W.2d 237 (1998), the law in question, Act 48 of 1977, permitted residents in border cities divided by a "street state line" to pay an additional one percent sales tax in exchange for an exemption from the state sales tax. The stated purpose of Act 48 was to equalize the tax burden for residents in these border cities, thereby offering tax inducements to people to locate their homes and businesses in Arkansas. The only city divided by a street state line was Texarkana, Arkansas. *Boyd*, 333 Ark. at 687.

This court rejected claims that Act 48 constituted special or local legislation, because the Act "ha[d] a valid purpose . . . to protect the border city by removing the inducement for that city to settle across the state line." *Id*. at 691. This court dismissed the argument that the Act arbitrarily treated Texarkana more favorably than a city like West Memphis, pointing out that West Memphis and Memphis, Tennessee, are separated by several miles and by the Mississippi River, but Texarkana, Arkansas, and Texarkana, Texas, were separated merely by a simple line on the map. Our court observed that "moving a home across one city street in what is essentially a combined city is categorically different from moving some distance away across a major waterway into a completely different urban environment." *Id*. at 692. For that reason, the legislature's decision to limit the effect of Act 48 to Texarkana was not arbitrary. Because the geographical limitation was rationally related to the purposes of the Act, the court declined to hold that Act special or local legislation. *Id*. at 694.

Our court decided the case of *McCutchen v. Huckabee*, 328 Ark. 202, 943 S.W.2d 225 (1997), utilizing the same reasoning. There, the challenged law was Act 739 of 1995, which appropriated $20 million to the Department of Finance and Administration to defray the cost for construction of a multipurpose civic center in Pulaski County. *McCutchen*, 328 Ark. at 205. The purpose of Act 739 was to "provide funds for the construction of a ' multipurpose civic center which would increase tourism, recreation, and economic development throughout the entire state." *Id.* at 209. This court found the singling out of Pulaski County for the location of the civic center to be rationally related to the purposes of the Act, because Pulaski County was the most populous county in the state, was centrally located, and was the seat of state government. These reasons, the court held, were "[n]either arbitrary [n]or capricious," and therefore, concluded that the decision to construct the civic center in Pulaski County was rationally related to the intended purposes of Act 739. *Id.*

In the present case, as noted above, the question is whether or not the August 1999 amendment was rationally related to the purpose of the rule, since the rule affected only Benton County. In viewing the facts in a light most favorable to the Commission, the trial court held yes, finding the legitimate purpose for the August 1999 amended rule was to meet a need for additional nursing home beds. The court stated that, for purposes of summary judgment, it accepted as true the Commission's contention that the amended rule applied to every county in the State because, in the future, other counties may have net numerical bed needs of 250 or more and have less than 94.5% occupancy. However, the trial court then concluded that it found no rational basis for excluding from the rule other counties showing a population-based net numerical need but low occupancy, stating that it could find no reason "for disregarding low occupancy in only one county when other counties showed net numerical need for additional nursing home beds in excess of 70 beds."

██ ██ We disagree with the trial court's ruling. We first reiterate our standard of review in matters such as these: this court will presume that legislation is constitutional and that it is rationally related to achieving a legitimate governmental objective. *See*

*Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). Further, it is not the court's role to discover the actual basis for the legislation; rather, our role is merely to consider if any rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives so that the legislation is not the product of utterly arbitrary and capricious government and void of any hint of deliberate and lawful purpose. *Id.* When dealing with agency rules, we recognize that administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts to determine and analyze issues affecting their agencies. *See Arkansas Health Services Agency v. Desiderata*, 331 Ark. 144, 958 S.W.2d 7 (1998).

It is not arbitrary to conclude that, regardless of the occupancy rate requirement of the population-based methodology, a nursing home is needed in any county where the projected bed need exceeds the existing bed need by 250 or more beds. It is within the discretion and expertise of the Commission to determine the criteria necessary for determining whether a nursing home is needed in any county. Additionally, it is reasonable to set the number at 250 in order to ensure that there is truly a need for new nursing home beds before overriding the occupancy-rate requirement. Both before the trial court and at oral argument, counsel for the State described the August 1999 rule as a "relief valve" that does not dispense with the occupancy requirement altogether, but instead permits the Commission to disregard the occupancy rate in a county where the projected need for that county exceeded the existing number of beds by 250 or more. By granting a permit for one new 70-bed nursing home in the face of a county's projected need for 250 beds over the next five years, even though the occupancy rate in that county is still below 94.5%, the Commission can determine whether the need is eased and can plan for future needs accordingly.

On the subject of future needs, and in further support of its argument that the classification is reasonable, the State cites the cases of *Murphy v. Cook*, 202 Ark. 1069, 155 S.W.2d 330 (1941), and *McLaughlin v. Ford*, 168 Ark. 1108, 273 S.W. 707 (1925), wherein this court validated population-based statutes that were open-ended, that is, while the acts applied to only one

county at the time of their enactments, it was conceivable that other counties could grow into that population bracket in the future. This prospective operation of the acts in issue in these two cases saved them from being unreasonable and arbitrary. For instance, in *McLaughlin*, a pre-Amendment 14 case, a 1923 act applied to "cities [with a commission form of government] which [had] a population of 25,000 or more according to the latest census taken by authority of the United States government." When the 1923 act was enacted, Fort Smith was the only city to meet the criteria. However, the *McLaughlin* court held that, "although it may happen that but one city may fall within the class named by the Legislature, it does not follow that other cities may not in the future come within the class and thereby be governed by the provisions of the act." *McLaughlin*, 168 Ark. at 1113. The *Murphy* court, faced with a similar situation, relied on *McLaughlin* to approve a statute that applied only to cities that had a population of 5,000 or more. There, Act 41 of 1941 stated that it was "intended to apply to all the counties of the state which now have cities of a population of 5,000 inhabitants or which may hereafter have cities of 5,000 population." Because other cities could easily come within this classification in the future, the *Murphy* court held Act 41 valid.

The State urges that the Commission's rule at issue here could, in the future, apply to other counties. Particularly, the State points out that "an applicant in any county in the State where the projected nursing home bed need exceeds the number of existing licensed beds in that county by 250 or more beds may apply for and receive a permit of approval to operate a seventy-bed facility." Further, the State urges, under the rule in question, other counties in the state where the projected bed need has not yet exceeded the existing bed need by 250 or more could subsequently come under the provisions of the regulation. The State notes that, at the time of the summary-judgment hearing, there was one county at 209 and one county at 160, and contends that both counties likely will meet the criteria within the next few years.

We agree. Under the August 1999 rule, it is conceivable that other counties in the State will, in the future, come

under its provisions. At the time the circuit court heard this matter, Garland County was projected to have a need for 209 beds by the year 2005, and Pulaski County was projected to have a need for 160 beds by that time. Clearly, as the need for more nursing home beds increases in this state, counties other than Benton County will come within the ambit of the August 1999 rule. As in *McLaughlin* and *Murphy*, it is not unreasonable to expect that other counties will come within the rule's classification in the future, and therefore, we conclude that the Commission did not act arbitrarily in singling out Benton County.

The State raises as a second point on appeal that the trial court's alleged error in granting summary judgment, at least in part, on the basis of the depositions of numerous Commission members who testified about the intent and purpose of the August 1999 rule. However, because we reverse on the point discussed above, it is unnecessary for us to consider this second issue further.

For the reasons above, we reverse and remand the trial court's decision.