McLANE COMPANY, INC. *v.* Charlie DAVIS, Director of the Arkansas Tobacco Control Board, the Arkansas Tobacco Control Board, and Earl Gill Wholesale, Inc.

02-1057                                    110 S.W.3d 251

Supreme Court of Arkansas
Opinion delivered June 12, 2003

*Williams & Anderson, LLP,* by: *Peter G. Kumpe, Stephen B. Niswanger,* and *Clifford P. Block,* for appellant.

*J. Leon Johnson,* Att'y Gen., by: *Arnold M. Jochums* and *Connie M. Carroll,* Ass't Att'ys Gen., for appellees.

*Lax, Vaughan, Fortson, & McKenzie, P.A.,* by: *Grant E. Fortson,* for appellee/intervenors.

TOM GLAZE, Justice. This case was previously on appeal before us as *McLane v. Weiss,* 332 Ark. 284, 965 S.W.2d 109 (1998)(*McLane I*), and the facts leading up to this litigation are thoroughly set out there. We review only those facts necessary to understand the issues raised in this second appeal.

McLane Company, Inc., a Texas corporation, is a wholly-owned subsidiary of Wal-Mart Stores, Inc. McLane is a wholesaler of cigarettes and other products, and is licensed to do business in Arkansas. This legal dispute began in 1995 when McLane contacted the Department of Finance & Administration (DFA), requesting the DFA to repeal a regulation, Miscellaneous Tax Regulation 1988-2, that it promulgated pursuant to Arkansas's Unfair Cigarette Sales Act, Ark. Code Ann. §§ 4-75-701 — 713 (Repl. 1996) (hereinafter

the Act).[1] The Act was enacted in 1951, and its declared purpose is to promote fair and honest competition by prohibiting the sales of cigarettes below cost in the wholesale or retail trades that are made with the intent of injuring competitors or destroying or substantially lessening competition. The Act defines cost to wholesalers as the wholesaler's basic "cost of cigarettes" plus the "cost of doing business," as evidenced by the standards and methods of accounting regularly employed by the wholesaler. *See* § 4-75-702(11)(A). The Act further provides that, in the absence of proof of a lesser or higher "cost of doing business" by the wholesaler making the sale, the "cost of doing business" shall be presumed to be two percent (2%) of the basic cost of cigarettes to the wholesaler plus cartage to the retailer outlet, which cartage cost in the absence of proof of a lesser or higher cost, shall be presumed to be three-fourths of one percent (.75%) of the wholesaler's basic cost of the cigarettes. *See* § 4-75-702(5)(B).

As previously mentioned, the Board in 1988 adopted Regulation 1988-2, which provides, among other things, that a wholesaler's cost of doing business is presumed to be four percent (4%), not the two percent (2%) set out in the Act. The Board promulgated 1988-2 under the authority of § 4-75-706(a)(1) and (2)(A), which empowers the Board to undertake and make cost surveys for the state or trading area which the Board's director defines and approves. When McLane contacted the Board about nullifying the Regulation's 4% requirement, it submitted to the Board a detailed and lengthy cost analysis that purportedly supported a lesser cost of doing business than either the presumed 2% specified in the Act or the presumed 4% set by the Regulation. After the Board reviewed McLane's proof, the Board's Director approved and established a lesser doing-business cost at one-half of one percent (.5%) of the basic cost of cigarettes.

---

[1] While the Department of Finance & Administration originally was the state department empowered to administer the Arkansas Unfair Cigarette Sales Act, that responsibility is now placed with the Arkansas Tobacco Control Board and its director. Because the Board is now the administering department, and for clarity in writing this opinion, we merely refer to the Board and its Director, since the Tobacco Control Board is presently empowered to administer and enforce the Act. Further, this opinion will refer only to the 1996 Replacement volume of the Arkansas Code, as that was the statutory law in effect at the commencement of this action.

The Director's approval of McLane's request resulted in the Board's promulgating Miscellaneous Tax Regulation 1995-5, which established that a wholesaler's cost is .5% of the basic cost of cigarettes. On October 25, 1995, the Director notified McLane that McLane could commence selling cigarettes at the new minimum price. However, on November 1, 1995, McLane's competitors filed suit in the Chicot County Chancery Court, requesting the Board be prohibited from implementing the new Regulation 1995-5 until such time as the Board developed administrative rules and procedures to review the statutorily mandated proof required to establish a wholesaler's cost of doing business. Although McLane was not a party to the suit, the Chicot County Chancery Court granted the relief McLane's competitors sought, and the Board subsequently rescinded its earlier approval of McLane's new cost-of-doing-business amount of .5%.

Next, in 1996, McLane filed this suit in Pulaski County Chancery Court against the Board's Director, and alleged the Act and Regulation 1988-2 were overbroad and unconstitutional deprivations of McLane's due process rights. McLane's competitors (hereinafter Intervenors) were allowed to intervene, and the Director and Intervenors successfully defended the constitutionality of the Act and the Regulation. In holding the two laws constitutional, the trial court granted the Intervenors' motion for summary judgment, denied McLane's summary judgment motion, and dismissed McLane's complaint. McLane appealed the chancery court's decision, and this court held that, on their face, both the Act and Regulation afforded McLane due process, and therefore, the laws were constitutional. *See McLane*, 322 Ark. at 298.

After deciding the constitutional issue, our court turned its attention to McLane's remaining alternative arguments, bearing on its contention that Regulation 1988-2 is invalid because it was facially inconsistent with the Act, and, at the very least, a question of material fact existed as to whether the Board acted arbitrarily when it adopted the Regulation. This court ultimately sided with McLane's position that the Pulaski County Chancery Court had erred in ruling on these arguments in the Intervenors' favor by granting their motion for summary judgment. Accordingly, we reversed and remanded for further proceedings to determine how and under what authority the Board acted when it determined and increased the basic cost of cigarettes to be 4%. *Id.* at 301.

On February 11, 2002, the Intervenors filed a motion for protective order in response to McLane's interrogatories, requests for production, and notice of deposition. After a hearing on February 13, the chancery court issued its protective order on February 25. Proceedings in this case were delayed until March 27, 2002, at which time the Pulaski County Chancery Court held a final hearing. The court's final order was filed and entered on June 24, 2002, wherein the chancellor declared the definition of "basic cost" contained in Regulation 1988-2 was void, but the remaining provisions of the Regulation were separable and therefore valid and enforceable as consistent with the Act. McLane now brings this appeal, setting out four primary points for reversal.

■ Before addressing McLane's arguments, we note our standard of review when considering the validity of a rule or regulation. That standard is set out in *Department of Human Services v. Berry*, 297 Ark. 607, 764 S.W.2d 437 (1989), as follows:

> [T]he court must give the regulation the same presumption of validity as it would a statute. *See Rowell v. Austin*, 276 Ark. 445, 637 S.W.2d 531 (1982). In reviewing the adoption of regulations by an agency under its informal rule-making procedures, a court is limited to considering whether the administrative action was arbitrary, capricious, an abuse of discretion or *otherwise not in accordance with the law*. *Arkansas Pharmacists Ass'n v. Harris*, 627 F.2d 867 (8th Cir. 1980). A court will not attempt to substitute its judgment for that of the administrative agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). A rule is not invalid simply because it may work a hardship, create inconveniences, or because an evil intended to be regulated does not exist in a particular case.

(Emphasis added.)

We now consider McLane's first argument, wherein it claims the promulgation and enforcement of Regulation 1988-2 is *ultra vires* of the Act. The Intervenors and Board initially respond by stating that McLane failed to argue in *McLane I* that the Board's regulatory increase of the presumptive cost of doing business to 4% from the 2% called for in the Act was *ultra vires*; consequently, that issue in *McLane I* becomes the law of the case. Citing *Alexander v. Chapman*, 299 Ark. 126, 771 S.W.2d 744 (1989), Intervenors and the Board contend that all questions which were actually presented, or which could have been presented, in the first appeal

are barred in this second appeal. Furthermore, the Intervenors urge that, not only did McLane not argue in *McLane I* that the increase of the presumptive cost of doing business to 4% was *ultra vires*, but McLane also is barred by the doctrine of judicial estoppel, because McLane took the inconsistent position in the first appeal that the Board *could* change the presumed percentage if the Board supported the change with a cost survey. The Intervenors and the Board fail to recognize that this second argument was made as an alternative one in the event this court rejected its *ultra vires* argument. We disagree that McLane is barred by either of these doctrines.

In *McLane I*, McLane expressly argued that the 4% markup in the 1988-2 Regulation was void, and this court specifically recognized that argument, noting McLane's argument that this Regulation was invalid because it was facially inconsistent with the Act. In that first appeal, we further stated that, at the very least, a question of fact existed as to whether the Board acted arbitrarily and capriciously when it promulgated the Regulation. We expressed our concern in light of our settled law that an agency has no right to promulgate a rule or regulation contrary to a statute or Act which is involved in this case. *McLane*, 332 Ark. at 298.

In addition, the Board and Intervenors in *McLane I* had summarily concluded that because the Board had interpreted the Act to permit the Board to promulgate the Regulation to establish a higher cost, the Board's actions in doing so should be deemed reasonable; however, our court stated its concern that the Board's and Intervenor's responses in no way explained how the Board's Regulation and actions fell within the Act's language or whether the Board followed the Act or Regulation when it determined and increased the basic cost of cigarettes. *Id.* at 299-300. We emphasized that, if the Board used Regulation 1988-2 to determine the increased presumptive amount, then it clearly omitted two core elements required by the Act. *Id.* at 300. As we alluded to above, this court further stated that, even where a portion of a regulation is void, that need not invalidate the whole Regulation if such portion is distinctly separable from the remainder which in itself contains the essentials of a complete regulation. *Id.* This court added that, except for the two core elements, the Regulation appeared consistent with the Act. In making these observations, we reversed and remanded this matter for proceedings to

determine under what authority the Board determined a whole-saler's basic cost, and what method the Board used to increase the presumptive cost of doing business. In view of the above, we har-bor no doubts in deciding that McLane's arguments in this appeal have been preserved and are not barred by either the law of the case or judicial estoppel.

Having decided that McLane preserved its *ultra vires* argu-ment, we turn to the merits of that issue. The Board and Inter-venors attempt to rebut McLane's argument that the Board's Regulation is *ultra vires* by pointing out that, under our case law, the Regulation is entitled to a presumption of validity. *See Arkan-sas Health Servs. Comm'n v. Regional Care Fac., Inc.*, 351 Ark. 331, 93 S.W.3d 672 (2002). The Board further adds that its Director is given broad powers to issue regulations under § 4-75-706(a)(1) of the Act, and the presumptive basic cost of doing business provided in the Act only holds true in the absence of proof of a higher or lower cost of doing business. The Board asserts such proof may well result when a wholesaler defends criminal charges of selling below cost, *see* § 4-75-708, or when a wholesaler seeks to obtain permission to sell at a price below the 2% cost provided by the Act. The Board continues its argument by contending that the Act contains an ambiguity on its face, and where a statute or Act is ambiguous, the court considers highly persuasive the interpreta-tion given the Act by the officials charged with its enforcement. *See Omega Tube & Conduit Corp. v. Maples*, 312 Ark. 489, 850 S.W.2d 317 (1993).

In *McLane I*, this court made it clear that, if the Board used Regulation 1988-2 when determining that the presumptive-cost amount was 4%, the Board omitted *at least* two core elements required by the Act — trade discounts and cartage. *McLane*, 332 Ark. at 300. Except for these two omissions in the Regulation, our court observed that the Regulation *appeared* consistent with the Act. *Id.* In making these observations, this court stated that, even though a portion of the Regulation is void because it is con-trary to the Act, it does not necessarily mean the whole Regula-tion is invalidated. This issue was remanded to the trial court for further examination; however, in doing so, the remand did not prevent the parties or the trial court from considering if the Regu-lation contained other provisions inconsistent with the Act that might bear on McLane's *ultra vires* argument. Because McLane

raised and successfully showed at least two important respects in which the Board's Regulation ran contrary to the Act, the Board then had the burden to demonstrate on remand whether the Regulation still fell within the Act's provisions and whether the Act continued to empower the Board to administer and enforce its Regulation.

Here, the trial court held that, while the Board's Regulation erroneously defined "basic cost" by omitting trade discounts and cartage, it further concluded that the remaining portion of the Regulation still gave the Board the power to administer and enforce the Act's provisions. However, we first must address McLane's argument regarding whether the Act was intended to give the Board the authority to alter the Act's presumptive 2% markup in any proceedings other than one involving court enforcement. The Board and the Intervenors contend the Board has been given such broad authority under § 4-75-706(a)(1), which provides that the Board shall prescribe, adopt, and enforce rules and regulations relating to the administration and enforcement of this Act. The Board submits it has interpreted this section of the Act to empower the Board to change *where necessary* the Act's presumptive 2% markup, stating that such interpretation is reasonable, considering that changes in costs of labor, transportation, storage, interest rates, taxes, and management could be expected to drive the cost of doing business above the presumed 2%. The Board further reasons that there have been seven regular sessions of the General Assembly since the Regulation's adoption in 1988, and, during those sessions, the General Assembly has not changed the Board's interpretation by amending the Act. In addition, the Board points out that even McLane acted consistently with the Board's interpretation of the Act when it petitioned the Board in 1995 to lower the presumptive cost of doing business from 4% to .5%.

■ When considering the parties' respective arguments, we conclude that the Board does have the broad power to change the Act's presumptive cost of doing business of 2%, but, in so holding, we do not believe that power is without limitations. For example, while the Board is mandated to adopt regulations to administer *and* enforce the Act under § 4-75-706(a)(1), the Board's Director also has been empowered, from time to time, to make one or more cost surveys for the State or such trading area as

the Director defines, and, when the Director makes or approves the survey, it shall be permissible to use the survey as provided in § 4-75-711(b). *See* § 4-75-706(a)(2)(A) (a cost survey may be made to determine the lowest cost to wholesalers within the area). However, under § 4-75-711(b), the cost survey is to be made by using "recognized statistical and cost accounting practices," and "the cost survey shall be deemed competent evidence in *any* action or proceeding under [the Act]." Section 4-75-711(b) further provides that "any party against whom any such cost may be introduced in evidence shall have the right to offer evidence tending to prove any inaccuracy in the cost survey or any state of facts which would impair its probative value." Moreover, § 4-75-702(11)(A) of the Act defines "cost to wholesaler" to mean the basic cost of the cigarettes involved to the wholesaler, plus the cost of doing business by the wholesaler, as evidenced by the standards and methods of accounting regularly employed by him or her, and must include, without limitation, labor costs, including salaries of executives and officers, rent, depreciation, selling cost, maintenance of equipment, delivery costs, all types of licenses, taxes, insurance, and advertising. The Act also clearly provides that any determination of the "basic cost of cigarettes" shall be based on the wholesaler's invoice or replacement cost of cigarettes within thirty days prior to the date of sale, in the quantity last purchased. *See* § 4-75-702(10).

In *McLane I,* we became aware that the Board omitted two core elements, trade discounts and cartage, which were not used to support the Board's calculations when determining its Regulation's 4% presumptive cost of doing business, even though the Act clearly provides for the wholesaler to account for cartage or amounts received as trade discounts. In the present case on appeal, we further discover from the record that other inconsistencies exist between the Act's requirements and the Board's actions, such as the previously mentioned recognized statistical and cost accounting procedures and the thirty-day limitation prescribed by § 4-75-702(10).

The Board counters McLane's argument that the Board failed to perform consistently with the Act's requirements, but the Board limits its argument by merely asserting it was authorized to change the Act's presumptive cost of doing business, and the Act is silent as to what method should be employed, or what type and amount of proof is necessary to make the change. The Board sur-

mises that such decisions must be left to the Board's discretion. We disagree. All parties agree that some efforts had been made to conduct a cost survey in the late 1970s, but it is also clear that survey did not seek information concerning trade discounts. Nor did the survey seek information pertaining to the invoice or replacement cost of cigarettes within thirty days prior to the date of sale; instead the Board's 4% markup in the 1988-2 Regulation was based on invoice or replacement costs that were nearly eight years old when the Regulation was adopted.

The Board concedes that no party was able to establish through testimony or documentary evidence (1) the actual years' costs surveys that were performed, (2) the actual number of surveys that were completed, (3) the actual number of wholesalers that were licensed and operating in the state at the relevant time period, or (4) the actual information that was gathered by the surveys. The Intervenors argue that McLane's contention that these past surveys were inadequate is merely an attack on the wisdom of the Board when the Board adopted the Regulation. The Intervenors urge that it is not the court's role to determine whether the Board acted wisely. In addition, Intervenors claim that, because the Board adopted its Regulation after notice and a public hearing, this is added reason for upholding the Board's action in adopting 1988-2. Citing the case of *Arkansas Board of Registration v. Ackley*, 64 Ark. App. 325, 984 W.W.2d 67 (1998), McLane counters the Intervenors' arguments, first by saying that the Board was not entitled to use its "wisdom" to ignore statutory requirements. As we said in *McLane I*, it is the role of the courts to determine if the Board has promulgated a regulation that is contrary to the Act. *McLane*, 332 Ark. at 298.

The Board takes issue with McLane's charges by summarily concluding that its absence of evidence to explain the factual basis for the 4% increase in the presumed cost of doing business contained in the 1988-2 Regulation fails to show the Board acted arbitrarily, capriciously, or unreasonably when promulgating the Regulation. The Board also opines that, while McLane continues to argue that the surveys were unreasonable because the information sought was inconsistent with the "recognized statistical and cost accounting practices" required by the Act, the burden was McLane's to offer proof regarding these matters, but it failed to do so. Of course, we already touched on this point

above, but suffice it to say that, in *McLane I*, we remanded this case to afford the Board the opportunity to explain how the Board's Regulation and its actions fall within the language of the Act and whether the Board followed the Act or Regulation when it increased the basic cost of cigarettes. Because the Board failed to show its Regulation and actions fell within the Act's provision, we conclude the 4% cost of doing business was arbitrary, *ultra vires*, and unenforceable.

■ We now turn to McLane's argument that the trial court erred in holding that Regulation 1988-2 is still valid and enforceable even though the Regulation contains a flawed definition of basic cost because it omits trade discounts and cartage. The trial court held that, although the basic cost definition is void, the remaining provisions of the Regulation are valid and enforceable. The trial court set out in its order our language in *McLane I* that, with the exception of the two omissions or flaws within the definition of "basic cost," the Regulation *appears* consistent with the Act. As we previously discussed, our court in *McLane I* did not foreclose the parties from discovering other flaws or inconsistencies that might be found between the Board's Regulation and the Act, and McLane did so. Regardless, the issue on remand is the same — whether the Board's Regulation and actions may prevail even though a portion(s) of the Regulation is (are) invalid. Stated another way, this court has adopted a rule that, where a portion of a regulation is void, that portion does not invalidate the whole regulation, when such portion is distinctly separable from the remainder of the regulation, which, in itself, contains the essentials of a complete regulation. *See McLane*, 332 Ark. at 300 (citing *McClendon v. City of Hope*, 217 Ark. 367, 230 S.W.2d 57 (1950).

McLane relies on the case of *Borchert v. Scott*, 248 Ark. 1041, 1050-I, 400 S.W.2d 28, 37-38 (1970) (supplemental opinion denying rehearing), for the proposition that, where a part of a statute or regulation is invalid, the remainder is not void "unless all the provisions are connected in the subject matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the Legislature [or regulatory body] would have passed the one without the other." McLane postulates that the Regulation's provisions here are connected in subject matter, depending on each other, and operating together for the purpose of prohibiting

wholesale sales below the Regulation's 4% presumptive markup. McLane further contends that the very foundation of the Regulation is the 4% markup, which is not authorized by the Act, yet the Board nevertheless arbitrarily adopted the markup that tainted the entire Regulation, making it invalid.

█ In response to McLane's argument, the Intervenors submit that the Regulation contains the essentials of a complete regulation without Regulation 1988-2's flawed definition of "basic cost," because the Act's definition will govern and the 2% presumptive cost of doing business will be employed. We agree. The regulatory provisions set out in 1988-2 are intended to aid the Board in enforcing and administering the Act, and to establish facts and lawful competition in the wholesale and retail sale of cigarettes. It also is clear that the determination of the presumptive cost of doing business plays an integral part in prohibiting sales made in violation of the Act. Further, even though the 4% basic cost is invalid and unenforceable, no reason is offered, nor do we know of one, why the Act's 2% presumptive cost of doing business would not govern, thereby triggering the other valid, remaining provisions in the Regulation.

McLane's final argument pertains to the trial court's ruling granting the Intervenor's motion for protective order and limiting discovery to the facts and circumstances relevant to, and existing at or before the time of, the Board's determination to increase the presumptive cost of doing business when it adopted the Regulation. McLane argues that its complaint and third amended complaint, filed the same date as the motion for protective order, alleged that the Board was arbitrarily enforcing the Regulation and that McLane sought discovery of facts regarding the Board's enforcement activity that have arisen since *McLane I.* Both the Board and Intervenors respond, claiming that discovery sought by McLane was oppressive, burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.

█ We do not reach the merits of this argument. This court has determined that the actions taken by the Board in raising the presumptive cost of doing business were *ultra vires* of the Act, and, in so doing, has found the actions of the Board to be arbitrary and unenforceable. We have determined that the presumptive cost of doing business is the 2% provided by the Act that was enacted

by the General Assembly. Therefore, the discovery sought is no longer necessary.

Affirmed in part and reversed and remanded in part for the trial court to enter an order consistent with this court's opinion.

IMBER, J., dissents.

CORBIN, J., not participating.

ANNABELLE CLINTON IMBER, Justice, dissenting. The majority concludes that the Arkansas Unfair Cigarette Sales Act, codified at Ark. Code Ann. §§ 4-75-701 — 713 (Repl. 2002) ("the Act"), gives the Arkansas Tobacco Control Board ("the Board")[1] the broad power to change the Act's presumptive cost of doing business. Because I believe the Act does not confer this authority on the Board, I must respectfully dissent.

The answer to this question can simply be found within the plain language of the Act itself. Section 4-75-702(5)(B) states the cigarette wholesaler's presumptive cost of doing business:

> In the absence of proof of a lesser or higher cost of doing business *by the wholesale dealer making the sale*, the cost of doing business by the wholesale dealer shall be presumed to be two percent (2%) of the basic cost of the cigarettes to the wholesale dealer, plus cartage to the retail outlet, if performed or paid for by the wholesale dealer, which cartage cost, in the absence of proof of a lesser or higher cost, shall be presumed to be three-fourths of one percent (0.75%) of the basic cost of the cigarettes to the wholesale dealer.

Ark. Code Ann. § 4-75-702(5)(B) (Repl. 1996) (emphasis added). The plain language of this subsection provides a mechanism to show a cost of doing business different than the 2% presumption. There is no mention made that the presumption can be changed.

The majority seems to state that the cost surveys mentioned in § 4-75-706 are the vehicle by which the Board may change the Act's presumptive cost; but that, in this case, the Board failed to follow the required procedures to do so. However, § 4-75-706 states in pertinent part:

---

[1] Prior to the passage of Act 1237 of 1999, the Department of Finance and Administration (DFA), rather than the Arkansas Tobacco Control Board, was the agency empowered to enforce the Unfair Cigarette Sales Act. Because this action was originally filed in 1995, the use of the term "Board" throughout will include both the Board and the DFA.

(a)(1) The Director of the Arkansas Tobacco Control Board shall prescribe, adopt, and enforce rules and regulations *relating to the administration and enforcement of this subchapter.*

(2)(A) The director is empowered to and may from time to time undertake and make or cause to be made one (1) or more cost surveys for the state or such trading area as he shall define, and when the cost survey shall have been made by or approved by the director, *it shall be permissible to use the cost survey as provided in § 4-75-711(b).*

Ark. Code Ann. § 4-75-706(a) (Repl. 2002) (emphasis added).[2]

As can be seen from the plain language of the statute, the Director must enforce *this subchapter*, but there is no authority to *change* the subchapter, contrary to the majority's assertion. In fact, by changing the presumptive cost of doing business, the Board actually violated, rather than enforced, the Act.

In regard to the cost surveys mentioned in § 4-75-706(a)(2)(A) above, there is no indication that those surveys may be used by the Board to change any portion of the Act. While this subsection does give the Board the authority to use cost surveys, the only enumerated use of them is found in § 4-75-711(b), as follows:

*4-75-711 Determination of cost generally — Cost surveys.*

(a) In determining cost to the wholesaler and cost to the retailer, the court shall receive, and consider as bearing on the bona fides of the cost, evidence tending to show that any person complained against under any of the provisions of this subchapter purchased the cigarettes involved in the complaint before the court at a fictitious price or upon terms or in such manner or under such invoices as to conceal the true cost, discounts, or terms of purchase, and shall also receive and consider as bearing on the bona fides of the costs, evidence of the normal, customary, and prevailing terms and discounts in connection with other sales of a similar nature in the trade area or state.

(b) Where a cost survey pursuant to recognized statistical and cost accounting practices has been made for the trading area in which a violation of this subchapter is committed or charged to determine and establish on the basis of actual existing condi-

---

[2] Until the passing of Act 1237 of 1999, the Act empowered the Director of the Arkansas Department of Finance and Administration to perform these duties. With that exception, this portion of the Act, and the acts it authorizes, remained the same.

tions the lowest cost to wholesalers or the lowest cost to retailers within the area, the cost survey *shall be deemed competent evidence in any action or proceeding under this subchapter* as tending to prove actual cost to the wholesaler or actual cost to the retailer *complained against*, but any party against whom any such cost survey may be introduced in evidence shall have the right to offer evidence tending to prove any inaccuracy of the cost survey or any state of facts which would impair its probative value.

Ark. Code Ann. § 4-75-711 (Repl. 2002).[3]

The plain language of the Act, when read in its entirety, makes it clear that while the Board may perform cost surveys to determine the lowest cost available to wholesalers or retailers in the state or in a trading area, and presumably the Board could then present those surveys to the General Assembly in order to make a convincing argument for the legislature to make a change in the presumptive cost of doing business, there is no authority in this Act for the Board to change that presumptive cost of doing business itself. In fact, the only specific way the Act empowers the Board to use those cost surveys is as evidence in an action or proceeding *against* a wholesaler or retailer for violation of the Act. In that instance alone, the Act authorizes the Board to use the cost surveys if they were performed pursuant to correct accounting practices, but allows the wholesaler or retailer charged with violating the Act to rebut those surveys if the wholesaler or retailer can offer evidence that would tend to show the cost surveys were inaccurate or that some other facts make the cost surveys lack probative value.

In this case, the Board was not able to show that the cost surveys in question were performed pursuant to recognized statistical and cost accounting practices. Even if the Board had been able to make such a showing, however, it still had no authority to use those cost surveys in a way that changed or violated the Act itself. There was no proceeding against a wholesaler or retailer of the type mentioned in § 4-75-711(b) prior to the passage of the Miscellaneous Tax Regulation 1988-2, which changed the presumptive cost of doing business from 2% to 4%.

---

[3] This subsection has not been changed since Act 101 of 1951.

Because the Act does not confer authority on the Board to change any portion of the Act itself, including the presumptive cost of doing business, I must respectfully dissent from the majority's holding that the Board has the broad power to do so.